**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 16-3599
_____

UNITED STATES OF AMERICA

v.

ALEJANDRO SOTELO,
a/k/a "Alex"

Alejandro Sotelo,
Appellant

_____

No. 16-3648
_____

UNITED STATES OF AMERICA

v.

FRANCISCO GONZALEZ JOSE,
a/k/a Franci, a/k/a Francisco Morales,

Francisco Gonzalez Jose,
Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Nos. 2-14-cr-00652-006 & 2-14-cr-00652-010)
District Judge: Mark A. Kearney

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
September 6, 2017

Before: CHAGARES, JORDAN, and HARDIMAN, <u>Circuit Judges</u>.

(Filed: September 26, 2017)
_____

OPINION[*]
_____

CHAGARES, <u>Circuit Judge</u>.

Alexander Sotelo and Francisco Gonzalez Jose were convicted by a jury of conspiracy, drug trafficking, and money laundering charges. The District Court sentenced Sotelo to 210 months of imprisonment and Gonzalez Jose to 220 months of imprisonment. Sotelo and Gonzalez appeal the District Court's judgments of conviction and sentence on various bases. For the reasons that follow, we will affirm in all respects.

I.

A.

We write solely for the parties' benefit and thus recite only the facts necessary to our disposition. On May 6, 2015, a grand jury returned a superseding indictment charging Sotelo, Gonzalez Jose, and others with conspiracy, drug trafficking, money laundering, and related crimes.[1] The charges were related to the activities of a drug trafficking organization led by Antonio and Ismael Laredo. The organization imported heroin from Mexico into the United States. The heroin would be sent to Philadelphia,

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] Citations to the Government's Supplemental Appendix are labeled as "Supp. App." Citations to Sotelo's Appendix are labeled as "Sotelo App." Citation to Gonzalez Jose's Appendix are labeled as "Gonzalez Jose App."

2

where it was eventually distributed to other dealers. The proceeds would be laundered back to Mexico via, inter alia, physical bulk cash shipments secreted in vehicles and suitcases, small Western Union wire transfers, and structured deposits into funnel accounts at banks.

The indictment alleged that Sotelo received shipments of heroin in Chicago and coordinated the transportation of the drugs to Philadelphia. The indictment further alleged that Gonzalez Jose served as a Philadelphia-based distributer of the heroin. Finally, the indictment asserted that Sotelo and Gonzalez Jose took steps to conceal and transport the proceeds of the Laredo organization's drug distribution.

The indictment charged both Sotelo and Jose on Count 1 (conspiracy to distribute one kilogram or more of heroin in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)), Count 2 (conspiracy to import one kilogram or more of heroin in violation of 21 U.S.C. §§ 963, 960(b)(1)(A)), and Count 44 (conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h)). They each faced two other counts: Sotelo was charged with Counts 14 and 20 (distribution of one kilogram or more of heroin in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)), and Gonzalez Jose was charged with Counts 13 and 36 (possession with intent to distribute one kilogram or more of heroin in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)). See Supp. App. 2-120.

## B.

Sotelo and Gonzalez Jose were the only charged defendants to go to trial. An eight-day jury trial took place in April 2016. Neither defendant testified at trial. The

3

Government presented the testimony of agents who investigated the Laredo organization and cooperating witnesses who participated in the organization's criminal activities. These witnesses implicated Sotelo and Gonzalez Jose as major players in the Laredo organization.

Among the most salient pieces of evidence presented were ledgers of drug transactions created by members of the Laredo organization. Law enforcement officers recovered ledgers from a search of the apartment of Joseph Torres and Bertin Torres Sanchez, cooperating witnesses who were among Antonio Laredo's point-men in Philadelphia. At trial, United States Drug Enforcement Agency ("DEA") Special Agent Patrick Moynihan testified that their electronic devices contained ledgers, which denoted "proceeds from the sale of their heroin, plus distribution amounts [Torres and Torres Sanchez] would receive from the organization in Mexico. They also kept track of which distributors in Philadelphia they gave or distributed heroin to and collected money from." Sotelo App. 186; see also Sotelo App. 187. Moreover, the ledgers contained a "supply distribution sheet" that "tracked the bulk amount of heroin that was being moved into Philadelphia." Sotelo App. 190. That information contained entries indicating that "proceeds generated from the sale of heroin in Philadelphia . . . was laundered back to Mexico." Sotelo App. 190-91; see also Sotelo App. 194. Special Agent Moynihan testified that the ledgers indicated that Sotelo transported drugs and cash for the organization. See Sotelo App. 188-89. Torres, who was a cooperating witness for the Government, corroborated the agent's testimony. He also explained that some of the ledger entries recorded bulk cash transfers to Sotelo or couriers who worked for him, who

4

would transport the money to Mexico.  See Sotelo App. 331-32, 339-40; 355.  Torres Sanchez, who also created ledgers, discussed entries involving Sotelo and noted that Sotelo would send heroin deliveries with couriers.  See Sotelo App. 466.

The ledgers also implicated Gonzalez Jose by detailing various transactions in which he transferred large amounts of cash to the Laredo organization and received heroin to distribute.  Moreover, another set of ledgers was uncovered from a search of Gonzalez Jose's home.  Special Agent Moynihan testified as to the contents of the ledgers, which covered drug transactions from 2010 to 2014 and documented weights of heroin, the date of distribution, the price per kilogram, payments to members of the Laredo organization, and the ongoing balance with the Laredo organization.

In addition to the ledgers, testimony from cooperating witnesses also linked both defendants to the Laredo organization.  The witnesses testified that Sotelo was responsible for delivering heroin from Chicago to Philadelphia and for transporting the proceeds back and eventually sending them to Mexico.  Torres testified that he personally saw Sotelo transporting hundreds of thousands of dollars of drug proceeds from Philadelphia.  See Sotelo App. 308-09, 319, 332, 349, 357.  He added that Sotelo was uniquely able to "move a lot more money because he had construction equipment in his van . . . [h]e liked to use that equipment in the work vehicle to transport the money in." Sotelo App. 319.  Torres testified that Sotelo provided him with the cash to physically transfer to Mexico, which he did approximately ten times.  See Sotelo App 320, 343. Torres Sanchez also testified that he knew Sotelo would "receive the drugs in Chicago [from Mexico], and he would send it over [to Philadelphia] with his driver."  Sotelo App.

5

449. Torres Sanchez testified that he understood individuals who arrived from Chicago — to whom he would give thousands of dollars of cash each time — were drivers who worked for Sotelo. Sotelo App. 455-56. He also testified that on one such occasion, he saw a driver and Sotelo in the car together, Sotelo App. 449, and that he once supplied Sotelo with a vehicle containing a secret compartment, Sotelo App. 448.

Witnesses described Gonzalez Jose as a key distributor of heroin in Philadelphia. Torres testified that he first met Gonzalez Jose around late 2009, when Antonio Laredo asked Torres to meet Gonzalez Jose in Philadelphia to vet him as a potential drug distributor. He noted that Gonzalez Jose became a trusted distributor for the Laredo organization and that the two became better acquainted over time. Torres explained that Gonzalez Jose took on more quantities of heroin, and that there was a procedure in place for bringing the proceeds back to the Laredo organization. Torres and Gonzalez Jose agreed to use "food saver machines to vacuum seal drugs and money" in order to create "proof that the money was complete." Sotelo App. 313. Moreover, Gonzalez Jose would hide the sealed money bags in designer shoeboxes, which were then placed in shopping bags.[2] He would deliver these hidden proceeds to Torres and other couriers. Sotelo App. 370, 474, 476.

Other cooperating witnesses testified that Gonzalez Jose was a consistent distributor for the Laredo organization in Philadelphia and that he would routinely deliver hundreds of thousands of dollars in drug proceeds to these witnesses, who would then be

_____

[2] Other members of the conspiracy used this identical method. Sotelo App. 161, 174, 350.

responsible for taking the proceeds and depositing or wire-transferring them according to Laredo's instructions. For example, one witness, Edwin Vidal, testified that he laundered drug proceeds for Antonio Laredo from 2012 to 2014. Vidal's associate Leandro Rodriguez would receive sums of money from Gonzalez Jose in the form of compressed sealed packages placed in large shopping bags. Vidal and Rodriguez would then go to multiple Western Union locations to conduct wire transfers. See Sotelo App. 399-401. Torres Sanchez also testified that he met Gonzalez Jose several times in Philadelphia for the purpose of drug transactions, and that each time he did so he would coordinate with either Antonio Laredo or Gonzalez Jose. See Sotelo App. 453-55. Another witness, Frank Felix-Herrera, testified that he delivered Gonzalez Jose heroin and deposited the proceeds from Gonzalez Jose at Laredo's instruction at Bank of America and Wells Fargo. See Sotelo App. 500.

Torres further testified that Gonzalez Jose laundered money in other ways, for example once completing "a bank deposit for Antonio [Laredo]." Sotelo App. 370. Torres testified he knew this occurred because when he was recording transactions in the ledgers, Gonzalez Jose told him he had deposited money for Laredo and Torres then "subtracted the amount from my ledger." Id.

Other physical evidence also implicated Gonzalez Jose. Special Agent Moynihan also testified that he conducted investigations outside and at the home of Gonzalez Jose, including general surveillance and "trash pulls" (collection of trash from the street curb). During those "trash pulls," he recovered deposit slips from Bank of America and drug paraphernalia containing heroin residue. See Sotelo App. 200, 202-03. The deposit slips

7

indicated that $20 bills in sequential order of their serial numbers were deposited in quantities that represented the maximum deposit amount that would not trigger further scrutiny. See Sotelo App. 231. The trash pulls also revealed a shoebox with notations written on it. Sotelo App. 203, 294.

On June 19, 2014, Special Agent Moynihan executed a search warrant on Gonzalez Jose's house. During that search, the agents recovered drug paraphernalia, a wrapped plastic bag containing about $24,000 in cash, a number of different bank cards (including an ID card with a photo that "looks like the defendant but . . . is not actually the defendant" and a different name), and several notebook ledgers. Sotelo App. 204-06. Gonzalez Jose was not arrested that day and was apprehended in December 2015 while using a false driver's license. Special Agent Moynihan also testified that Sotelo and other members of the organization were arrested on June 2, 2015 in and near Chicago.

While the jury was deliberating, one of the jurors became ill. As a result, the District Court dismissed that juror and substituted an alternate juror. The Judge then instructed the jury panel:

> Ladies and gentlemen, I -- I appreciate your extraordinary efforts. As you may know, we have replaced one Juror Number 10 with an alternate and I appreciate the alternate's service.
>
> Under the law the selection of a foreperson remains. I don't need to know that. The selection of a foreperson remains, but with a new alternate that person has to be brought up to speed on any decisions, determinations and you have to, sort of -- so I don't want to know this.
>
> But by way of example if you had a sheet of paper and you went through Questions 1 and 2 or 1(A) or whatever you did, you'd have to ask that person their view just like -- just like they were in the room.

8

So you have to start over at one and say -- I don't know the person's name -- I don't know the person's name, let's say it's Bill or Sue -- Sue, you know, what do you think about what do you think about one? What do you think about two? You know that kind of thing you have review. And then if your minds change because of what Bill or Sue says then you have to revisit the issue.

And if you've taken a vote -- this is the most important -- if you've taken a vote on any issue already that has resulted in a number -- that resulted in something on the piece of paper then you have to revote that number. Okay.

Sotelo App. 681-82. The jury convicted Sotelo and Gonzalez Jose of all counts charged against them,[3] except that Sotelo was acquitted on Count 20 (one of the two heroin distribution charges).[4]

## C.

The United States Probation Office prepared presentence reports for both defendants, and concluded that each had an advisory Guidelines sentence of life imprisonment. Both defendants also faced mandatory minimum terms of imprisonment of 10 years.

At Sotelo's sentencing, his counsel argued to the District Court that the mandatory minimum sentence of 10 years is unconstitutional as applied to Sotelo because of his

---

[3] The jury deliberated for approximately an hour and a half before the District Court was notified that one juror was feeling ill. After the alternate was empaneled, the jury deliberated for about two hours and fifteen minutes before reaching a verdict.

[4] The District Court denied Sotelo and Gonzalez Jose's motions for judgment of acquittal under Rule 29 and for a new trial under Rule 33 of the Federal Rules of Criminal Procedure.

advanced metastatic gastrointestinal liver cancer. <u>See</u> Sotelo App. 743, 745, 753-55.[5]
The District Court ultimately rejected the constitutional challenge to the mandatory minimum. Sotelo App. 769-71. He also denied the defendant's objections to the advisory Guidelines sentence calculated by the United States Probation Department, concluding that the enhancement under U.S.S.G. § 1B1.3 was applicable. Sotelo App. 771-72. The District Court also denied the motion for a departure from the advisory Guidelines sentence of life, Sotelo App. 773-74, but concluded that after considering the relevant 18 U.S.C. § 3553(a) factors, the appropriate sentence is 210 months of incarceration, Sotelo App. 791.

At Gonzalez Jose's sentencing, his counsel objected, <u>inter alia</u>, to the application of U.S.S.G. § 2S1.1 for sophisticated money laundering, arguing that his personal conduct regarding the drug proceeds was not sophisticated money laundering. The District Court overruled the objection. Gonzalez Jose App. 636. The court ultimately sentenced Gonzalez Jose to 220 months of imprisonment. Gonzalez Jose App. 660.

Sotelo and Gonzalez Jose timely appealed.

---

[5] Sotelo's counsel also asserted that Sotelo will not receive "compassionate release" from the Bureau of Prisons because "their regulations under the CFR . . . [do not] give compassionate release to any individual, who at the time of the sentencing, the conditions of that individual's sickness and/or disability was made aware to the Court." Sotelo App. 754.

II.[6]

A.

We will first address Sotelo and Gonzalez Jose's argument that the District Court

erred in its instructions after replacing one juror with an alternate by failing to instruct the

jury to "begin its deliberations anew," as required by Rule 24 of the Federal Rules of

Criminal Procedure.

Because neither appellant raised this issue before the District Court, we review it

for plain error.[7]  United States v. Miller, 527 F.3d 55, 60 (3d Cir. 2008).  Under plain

error review, we will "grant relief only if we conclude that (1) there was an error, (2) the

error was 'clear or obvious,' and (3) the error 'affected the appellant's substantial

rights.'"  United States v. Stinson, 734 F.3d 180, 184 (3d Cir. 2013) (quoting Puckett v.

United States, 556 U.S. 129, 135 (2009)).  When these three prongs have been satisfied,

we may exercise our discretion to correct the forfeited error if it "seriously affects the

fairness, integrity, or public reputation of judicial proceedings."  Id. (alterations omitted).

We have held that "a violation of the established criminal procedure is not

sufficient in itself to create a constitutional violation" and that the specific wording of

Rule 24 does not hold "talismanic" value.  Claudio v. Snyder, 68 F.3d 1573, 1576-77 (3d

---

[6] The District Court had jurisdiction under 18 U.S.C. § 3231.  This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

[7] The defense did not object when the District Court gave its instruction, or at any point thereafter.  Sotelo App. 681-85.  The District Court also previewed its instruction without objection from defense counsel.  Sotelo App. 666 ("I'd have to direct the jury . . . to begin, you know, their consideration or at least bring him – bring him up so he can appreciate or be involved in any of the questions they've already addressed . . . .").

Cir. 1995), as amended (Dec. 1, 1995). So long as the district court's instruction to the jury upon the substitution of an alternate is the "functional equivalent" of an instruction to begin deliberations anew, there is no violation of the defendant's constitutional rights. Id. at 1577. The parties contest whether the District Court's instructions in the instant case qualified as the "functional equivalent" of an instruction to begin deliberations anew.

The District Court instructed the jury that it would have to "ask [the alternate] their view just like -- just like they were in the room." He further instructed: "[Y]ou have to start over at one and say . . . Sue [the alternate juror], you know, what do you think about what do you think about one? What do you think about two?" He also directed the jury: "[I]f your minds change because of what [the alternate juror] says then you have to revisit the issue." Sotelo App. 681-82. We need not determine whether the District Court's statements, taken as a whole, were the functional equivalent of "begin your deliberations anew," because even if the court had erred, such error was not "clear or obvious . . . rather than subject to reasonable dispute." Puckett, 556 U.S. at 135. Moreover, the appellants have not proffered anything to show that any error would have affected the outcome of the proceedings. For these reasons, this claim does not survive plain error review.

### B.

Sotelo next argues that the testimony of Special Agent Moynihan and cooperating witness Torres Sanchez constituted inadmissible hearsay. Sotelo did not preserve this issue at trial. In his post-trial briefing, he alluded to this argument but failed to identify

12

any specific statement as hearsay. On appeal, the only specific citations to hearsay that Sotelo identifies at any point are: 1) a short excerpt from Moynihan's testimony, Sotelo Br. 9 (citing Sotelo App. 189), and 2) Torres Sanchez's testimony that he transferred money to drivers who he understood worked for Sotelo, Sotelo Br. 10 (citing Sotelo App. 455-56.) We review only these specific instances of alleged hearsay for plain error.[8]

The testimony of Special Agent Moynihan that Sotelo challenges as hearsay contains a discussion of a drug ledger that was seized from an apartment of Torres and Torres Sanchez. Special Agent Moynihan testified as to contents recorded in the ledger. Sotelo App. 189. Sotelo provides us with little direction as to what aspect of this testimony is hearsay. To the extent that he argues that the contents of the ledgers are inadmissible hearsay, we disagree, as the ledgers were prepared by Torres and Torres Sanchez and are thus the statements of co-conspirators in furtherance of the conspiracy and business records. See Fed. R. Evid. 801(d)(2)(E), 803(6)(B).

The Government does acknowledge that Special Agent Moynihan's statement that "Alex" in the ledger referred to Sotelo was hearsay. Government Br. 57. Yet to prevail under plain error review, Sotelo would have to demonstrate that admission of this statement was "clear or obvious" error, affected his substantial rights, and merits our discretionary action to reverse. We conclude that he has not met that standard, as Special

---

[8] Any other allegations of hearsay are forfeited. "An appellant's brief must contain his or her argument, which must incorporate 'appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies . . . .'" United States v. Hoffecker, 530 F.3d 137, 162 (3d Cir. 2008) (quoting Fed. R. App. P. 28(a)(9)(A)).

13

Agent Moynihan's identification of the notation "Alex" as referring to Sotelo did not "affect[] the outcome of the district court proceedings." Puckett, 556 U.S. at 135 (quoting United States v. Olano, 507 U.S. 725, 734 (1993)). There was ample alternative evidence at trial to support the linking of the "Alex" notation to Sotelo. For example, Torres Sanchez testified about the contents of the ledger that he created and stated that "Alex" referred to Sotelo and there was "just the one" Alex in the Laredo organization. Sotelo App. 458. Other witnesses consistently testified that "Alex" referred to Sotelo. There is no evidence in the record to the contrary.

The District Court's admission of Torres Sanchez's testimony that he transferred drug proceeds to drivers who worked for Sotelo was also not in error. Statements from third parties who told Torres Sanchez the drivers worked for Sotelo were admissible for non-hearsay purposes because they were not introduced for the truth of the matter, but rather to show the effect on Torres Sanchez. Fed. R. Evid. 801(c)(2). Torres Sanchez testified that he would meet the drivers knowing that Sotelo "would receive the drugs in Chicago, and he would send it over with his driver." [9] Sotelo App. 449. Finally, these statements are also subject to the co-conspirator declaration hearsay exception. See Fed.

---

[9] Moreover, Torres Sanchez had encountered Sotelo personally in the past and knew that his own job was to provide drug proceeds to Sotelo or Sotelo's couriers. Torres Sanchez testified that on at least one such occasion, Sotelo was sitting in the vehicle as he delivered the cash to the driver. Sotelo App. 449 ("I saw the driver, the driver that had brought the drugs here . . . there was a driver and there was Alex there also."). Torres Sanchez also testified that on one occasion (it is unclear if it was a different instance), he saw Sotelo "at a hotel where drugs were found later. I gave him a green pickup to him and to a woman . . . The vehicle had a secret compartment in the rear." Sotelo App. 448. He testified that another co-conspirator, Luis Deheza Laredo, instructed him to deliver the car, and he complied and gave the keys to Sotelo. Sotelo App. 448.

14

R. Evid. 801(d)(2)(E).   Thus, Sotelo has not identified error in admitting this testimony from Torres Sanchez and his hearsay claims fail.

C.

Sotelo also asserts that he was deprived of his Sixth Amendment Confrontation Clause rights because the Court admitted the physical ledgers seized from Gonzalez Jose's home despite the fact that Gonzalez Jose did not testify.  This argument is foreclosed by our precedent.

First, we note that we again review for plain error because the defense did not object at trial.  Stinson, 734 F.3d at 184.  We conclude that Sotelo has identified no error at all.  In Bruton v. United States, 391 U.S. 123, 126 (1968), the Supreme Court held that the Confrontation Clause of the Sixth Amendment bars the introduction of a confession from a co-defendant who does not testify if such testimony directly implicates the defendant at issue.  See United States v. Berrios, 676 F.3d 118, 128 (3d Cir. 2012).  The protections under Bruton, which stem from the Confrontation Clause, do not extend beyond testimonial statements.  Id.  Sotelo recognizes this limitation, but asserts that Gonzalez Jose's ledgers "should be considered testimonial because the author of the drug ledger knew or should have known [that] at some point, if discovered, the ledger would have been used in a criminal prosecution thereby implicating the legal notion of 'testimonial.'"  Sotelo Br. 12-13.  This position is implausible.  Gonzalez Jose's ledger of his drug transactions cannot be construed as testimonial — a "solemn declaration or affirmation made for the purpose of establishing or proving some fact."  Crawford v. Washington, 541 U.S. 36, 51 (2004) (citation omitted).

15

In Melendez-Diaz v. Massachusetts, the Supreme Court held that the affidavits of drug laboratory analysts were "testimonial" under the Sixth Amendment because the "analysts were aware of the affidavits' evidentiary purpose" — to provide "prima facie evidence" regarding the drugs at a criminal proceeding. 557 U.S. 305, 311 (2009) (citation omitted); see also Bullcoming v. New Mexico, 564 U.S. 647, 657 (2011). Sotelo appears to argue that Gonzalez Jose's ledgers should be viewed similarly in the sense that Gonzalez Jose might have known that if he were arrested, and if the ledgers were seized, they may be introduced at trial. This is a far stretch from the laboratory analyst who prepares a report for court. It is simply illogical to conclude that a drug distributor's records of illicit transactions made prior to being apprehended by law enforcement were created for the purpose of providing evidence of such illegality. Sotelo therefore cannot avail himself of the protections under Bruton.[10]

D.

Gonzalez Jose argues that there was insufficient evidence at trial to convict him of conspiracy to commit money laundering. Because this appeal comes to us following a jury's guilty verdict, we "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt." United States v. Caraballo-Rodriguez, 726 F.3d 418, 430 (3d Cir. 2013) (en banc) (alterations omitted) (quoting United States v. Brodie, 403 F.3d 123, 133

---

[10] Moreover, Sotelo has not advanced any argument regarding the prejudicial impact of Gonzalez Jose's ledger. Indeed, there is no indication in the record that Gonzalez Jose's ledgers referenced Sotelo. See Sotelo App. 797-858.

16

(3d Cir. 2005)).  In so doing, we must not "usurp the role of the jury by weighing credibility and assigning weight to the evidence," but rather must uphold the verdict "as long as it does not fall below the threshold of bare rationality."  Id. at 430-31 (quotation marks and citations omitted).

Gonzalez Jose was convicted of violating 18 U.S.C. § 1956(h), which provides:

> Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

Hence, to prove a violation of § 1956(h), the Government must prove:  "(1) that an agreement was formed between two or more persons; and (2) that the defendant knowingly became a member of the conspiracy."  United States v. Greenidge, 495 F.3d 85, 100 (3d Cir. 2007).  The underlying substantive crime, 18 U.S.C. § 1957(a), requires the Government to prove:  "(1) the defendant engage[d] or attempt[ed] to engage (2) in a monetary transaction (3) in criminally derived property that is of a value greater than $10,000 (4) knowing that the property is derived from unlawful activity, and (5) the property is, in fact, derived from 'specified unlawful activity.'"  United States v. Sokolow, 91 F.3d 396, 408 (3d Cir. 1996) (quoting United States v. Johnson, 971 F.2d 562, 567 n.3 (10th Cir. 1992)).  Gonzalez Jose challenges the verdict by arguing that his payments to the Laredo organization were "merely for the purpose of meeting his financial obligations" incurred from receiving heroin, and not with the intent to join the "conspiracy to hide or conceal these funds so that they could be unlawfully delivered to Antonio Laredo in Mexico."  Gonzalez Jose Br. 19.

17

Yet the evidence at trial shows that a reasonable jury could have determined that Gonzalez Jose knowingly agreed to participate in that precise conspiracy. Gonzalez Jose sought to become a major distributor for the Laredo organization, and he succeeded. Sotelo App. 312. By 2012, the Laredo organization was supplying him with 25 to 30 kilograms of heroin per month. Sotelo App. 308, Supp. App. 314. At times, he was the Laredo organization's exclusive distributor in Philadelphia. Sotelo App. 307, 311-33.

Moreover, the evidence demonstrated that Gonzalez Jose was not an arms-length client of the Laredo organization, but rather a trusted member who participated in decisionmaking processes to advance the goals of the organization. Torres, who was "in charge of the money [operation]" for a period of time in Philadelphia, Sotelo App. 314, testified that after Gonzalez Jose demonstrated his ability to distribute drugs for the Laredo organization, the two became close, Sotelo App. 307-08. In fact, it was Gonzalez Jose who recommended to Torres to "find a house where he [Gonzalez Jose] could specifically go to and where we could do business where everything would be safer than my current situation, which I was staying at a different distributor's house and ultimate competitor's house." Sotelo App. 308.

One method in which the Laredo organization laundered money was through bulk transfers, sometimes in vehicles with hidden compartments. Sotelo App. 319. The methods of transporting bulk cash were agreed upon in advance. Torres and Gonzalez Jose agreed to use "food saver machines to vacuum seal drugs and money" in order to create "proof that the money was complete." Sotelo App. 313. Moreover, Gonzalez Jose would hide the sealed money bags in designer shoeboxes, which were then placed in

18

shopping bags. He would deliver these hidden proceeds to Torres and other couriers, who would then use wire transfers or structured deposits to funnel the money to the Laredo organization in Mexico. Sotelo App. 370. That the shoebox method was a standard procedure was shown through Torres's testimony that other members of the conspiracy, including himself, used this identical method. He explained, "these boxes were reused over and over, and that's why you will see the scratched out number on top." Sotelo App. 350; see also Sotelo App. 476 (Frank Christian Peralta testifying he also received drug proceeds from Gonzalez Jose hidden in sneaker boxes). Arrests of other members of the conspiracy also yielded shoe boxes containing large amounts of cash, similar to Gonzalez Jose's arrest. Sotelo App. 161, 174.

The evidence also showed that Gonzalez Jose took direction from Antonio Laredo directly. Torres testified that Antonio Laredo would direct members of the organization to complete bank deposits in amounts under $10,000 to avoid a cash transaction report. Torres explained, "[a]s I deposited the money, [members of the organization] would withdraw the money, and they would either take it down to [Laredo] in Mexico or also send Western Unions from their location." Sotelo App. 319. Torres testified that Laredo frequently called distributors and money launderers with instructions on bank deposits. Sotelo App. 342. Torres testified that he knew that Gonzalez Jose personally participated in one such bank deposit for Laredo, because "when we did the ledgers, [Gonzalez Jose] said that he did a bank deposit for Antonio, so I subtracted the amount from my ledger." Sotelo App. 370. A reasonable jury could have found that Gonzalez Jose communicated with Laredo directly and that he knew the proceeds were to make their way to the

19

Laredos in Mexico. For example, he told a co-conspirator, Frank Felix-Herrera, that "I have been working with these people before you were," referring to Antonio and Ismael Laredo. Sotelo App. 498. Felix-Herrera delivered Gonzalez Jose heroin and deposited cash at the Laredos' instruction at Bank of America and Wells Fargo. Sotelo App. 500.

Because a reasonable jury could have determined that the evidence supported Gonzalez Jose's conviction on the conspiracy to commit money laundering charge, his attack on the verdict fails.

E.

Gonzalez Jose further asserts that the sentencing enhancement for sophisticated money laundering under U.S.S.G § 2S1.1(b)(3) did not apply to him. "We review a District Court's interpretation of the Sentencing Guidelines de novo and its application of the Guidelines to the facts for clear error." United States v. Woronowicz, 744 F.3d 848, 850 (3d Cir. 2014).

Section 2S1.1(b)(3) of the advisory Sentencing Guidelines provides for a two-level enhancement if "the offense involved sophisticated [money] laundering." The application notes accompanying the Guidelines provides: "'[S]ophisticated laundering' means complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense" and "typically involves the use of . . . fictitious entities; . . . shell corporations; . . . two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or . . . offshore financial accounts." U.S.S.G. 2S1.1, App. Note 5(A).

20

We have held that these factors are not exhaustive. United States v. Fish, 731 F.3d 277, 280 (3d Cir. 2013).

Gonzalez Jose argues the District Court should have only examined whether Gonzales Jose's own conduct was sophisticated money laundering, and not whether the entire money laundering scheme was sophisticated. Gonzalez Jose's position is untenable in light of our holding in Fish. There, we concluded:

> It is clear from the reasoning of the District Court that the elements of complexity and intricacy of the scheme that the District Court found to be relevant were the duration of the scheme, the difficulty in uncovering it because of the use of multiple outlets for cash exchanges, multiple couriers and other participants, and multiple locations; the secrecy of the underlying aspects of the scheme; the efforts to evade detection by the use of codes and untraceable electronic devices; and the multiple sources of cash.

Id. at 280. In Fish, we cited the district court's conclusions regarding the sophistication of the scheme, not of the individual's specific role in the scheme. See id. ("[T]he District Court appropriately considered the factors that make a scheme sophisticated and that it did not err in establishing that the facts of the scheme supported the determination of sophistication." (emphasis added)). Gonzalez Jose's position is also untenable because it would mean a sophisticated money laundering enterprise that intentionally breaks down its complex operations into a series of discrete straightforward tasks would escape this sentencing exposure by the mere fact that each participant plays a limited, "unsophisticated" role. We therefore agree with the District Court's conclusion that "because the offense involves sophisticated money laundering," and Gonzalez Jose participated in the scheme by transporting concealed bulk payments and by transferring

21

bulk drug proceeds to the Laredo organization, the enhancement was appropriate.

Gonzalez Jose App. 636.

F.

Sotelo contends that the District Court erred in sentencing him to 210 months of imprisonment. He asserts that the District Court erred in calculating his advisory Guidelines sentence by finding him responsible for 90 kilograms or more of heroin and by finding that he was a leader or organizer under U.S.S.G. § 3B1.1. Sotelo also argues that the sentence violated his constitutional right against cruel and unusual punishment, the District Court should have granted his downward departure motion, and that the sentence is substantively unreasonable.

1.

We first turn to Sotelo's arguments challenging the District Court's calculation of his advisory Guidelines sentence, which are attacks on the procedural reasonableness of the sentence. We conclude that these challenges are without merit. As discussed above, we review the District Court's legal interpretations of the Guidelines de novo and the application of the Guidelines to the facts for clear error. Woronowicz, 744 F.3d at 850.

First, the District Court did not clearly err in determining that Sotelo was responsible for 90 or more kilograms of heroin by a preponderance of the evidence and thus subject to a base offense level of 38 under U.S.S.G. § 2D1.1(a)(5) and (c)(1). Sotelo argues that this quantity of drug distribution was not reasonably foreseeable to him. Sotelo Br. 22. The District Court, however, considered the fact that the Laredo organization distributed "about twelve to fifty kilograms a month" totaling "more than a

22

thousand kilograms of heroin" and the extensiveness of Sotelo's involvement in such an enterprise. Sotelo App. 772, 783. Sotelo's couriers delivered at least twenty-eight kilograms of heroin in a two-month period in 2013 alone. Sotelo App. 345-47. The District Court did not clearly err in concluding that, considering all reasonably foreseeable acts in furtherance of the jointly undertaken criminal activity, U.S.S.G. § 1B1.3(a)(1)(B), the heroin trafficking attributable to Sotelo was 90 kilograms or more.

Second, the District Court did not clearly err in applying a four-level enhancement pursuant to U.S.S.G. § 3B1.1(a) for Sotelo's role as a manager, leader, or organizer.[11] The District Court found by a preponderance of the evidence that Sotelo directed couriers to deliver heroin to Philadelphia and to collect the proceeds of the heroin's subsequent distribution. This was amply supported by the evidence, which demonstrated that Sotelo, along with other members of the Laredo organization, led and organized others in the conspiracy.

2.

We will next address Sotelo's arguments regarding the constitutionality of his sentence. In limited circumstances, a sentence can be challenged on the basis that it is "grossly disproportionate to the severity of the crime." Rummel v. Estelle, 445 U.S. 263, 271 (1980). Sotelo does not argue that his crime of participating in a large international heroin distribution and money laundering enterprise is "grossly disproportionate" to his

---

[11] In determining that the § 3B1.1 enhancement is proper, we must also reject Sotelo's argument that this prerequisite for a two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(15)(C) for Sotelo's direct involvement in importation of heroin was not met.

23

below-Guidelines, 210-month sentence. Rather, Sotelo argues only that his advanced terminal illness makes his punishment cruel and unusual under the Eighth Amendment. We cannot agree. Where, as here, "the defendant fails to demonstrate a gross imbalance between the crime and the sentence, a court's analysis of an Eighth Amendment challenge is at an end." United States v. Burnett, 773 F.3d 122, 137 (3d Cir. 2014). We have also rejected arguments that sentences that effectively mean the defendant will die in prison are unreasonable. See id. at 137 n.4; United States v. Watson, 482 F.3d 269, 273 (3d Cir. 2007) (upholding 15-year term of imprisonment for a robbery defendant who suffered from HIV).

We must also reject Sotelo's argument that the District Court erred in denying his motion for a downward departure under U.S.S.G. § 5H1.4, which allows for a departure for "[a]n extraordinary physical impairment . . . ; e.g., in the case of a seriously infirm defendant[.]" We lack jurisdiction to review a discretionary denial of a motion for departure under the advisory Guidelines except when "the District Court was unaware of its discretion to grant the motion." United States v. King, 604 F.3d 125, 141 n.9 (3d Cir. 2010). Here, the District Court considered all of the arguments raised by Sotelo and exercised its discretion in denying the motion for a departure. Sotelo App. 773-74, 791 (denying the motion for a downward departure but considering Sotelo's health in reviewing the 18 U.S.C. § 3553(a) factors).

Finally, Sotelo's sentence was not substantively unreasonable. We only overturn a sentence as unreasonable when "no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided."

24

United States v. Tomko, 562 F.3d 558, 568 (3d Cir. 2009) (en banc). Here, the District Court thoroughly considered Sotelo's individual characteristics in reviewing the 18 U.S.C. § 3553(a) factors and has undoubtedly "considered the parties' arguments and has a reasoned basis for exercising [its] own legal decisionmaking authority." Rita v. United States, 551 U.S. 338, 356 (2007). The District Court considered the enormity of the Laredo organization's enterprise and the sizable role that Sotelo played in it, including his role in supervising others and in recruiting members of the organization. The court reviewed Sotelo's personal history, including his upbringing and current family obligations as well as Sotelo's legitimate work. The court noted that Sotelo has never shown remorse for his crimes. Finally, the District Court considered the facts relating to Sotelo's illness, noting that it "would never suggest . . . that we do not have great compassion for you and for your family" as a result of the disease. Sotelo App. 786. The court added that factors such as deterrence, promoting respect for the law, protecting the public from further criminal activity, and preventing unwarranted sentencing disparities all militate in favor of a sentence above the mandatory minimum. The court ultimately imposed a sentence that was significantly below the advisory Guidelines sentence of life imprisonment. Because the District Court's consideration of the relevant § 3553(a) factors was "rational and meaningful," United States v. Grier, 475 F.3d 556, 571 (3d Cir. 2007) (en banc), and because a "reasonable sentencing court [c]ould have imposed [this] sentence," Tomko, 562 F.3d at 568, we conclude that the sentence was not substantively unreasonable.[12]

---

[12] We have considered all other arguments made by the appellants and conclude that they

## III.

For the foregoing reasons, we will affirm the District Court's judgments of conviction and sentence.

---

are without merit.