******************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

STATE OF CONNECTICUT *v.* DEONTE
O. TOMLINSON
(SC 20192)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Keller and Vertefeuille, Js.

*Syllabus*

Convicted of the crimes of murder and carrying a pistol without a permit
in connection with the shooting death of the victim, the defendant
appealed to this court. The state's theory was that the defendant and
the victim were members of rival gangs, the "150 gang" and the "Green
Hollow Boyz," respectively, and that the defendant shot the victim in
retaliation after the victim had been tried for and acquitted of the murder
of H, another 150 gang member. At the time the victim was shot, the
defendant's acquaintance, M, was in a nearby car driven by her friend,
J. M saw the defendant, whom she knew as "DT," cross the street and
then heard gunshots. Meanwhile, J was having a phone conversation
with her incarcerated boyfriend, D, on a recorded line. Within minutes
of the shooting, M spoke to D and identified the defendant as the shooter.
The police also executed a search warrant at the defendant's apartment
on the night of the shooting. In one of the bedrooms, they found a
mirror, on which someone had written "150," "GANG" and "DT." Prior
to trial, the defendant sought to preclude evidence of his association
with the 150 gang and a rap music video that had been posted on the
Internet, which featured the defendant and two other members of the
150 gang, who were handling a gun. The trial court made preliminary
rulings denying the defendant's motions. At trial, the state sought to
present the expert testimony of A, a gang intelligence sergeant for the
Bridgeport Police Department. Defense counsel objected, claiming that
A's testimony was inadmissible because it was irrelevant insofar as there
was no direct evidence that the defendant belonged to a gang or that
the shooting was gang related. He also claimed that A's opinions were
based on hearsay and that, as an expert witness, A was not allowed to
testify as to hearsay. The trial court overruled the objection, and A
testified that his duties included monitoring gang activity in Bridgeport
through social media, where he discovered the rap music video, and by
talking with community residents, informants and gang members. He
stated that he was familiar with the rival gangs, that the defendant and
H were members of the 150 gang, and that H's death contributed to a
conflict between the two gangs. In conjunction with A's testimony, the
state introduced the rap music video, which was played for the jury over
defense counsel's renewed objection. Defense counsel also renewed his
objection when the state sought to admit photographs of the writing
on the mirror, but the trial court concluded that the photographs were
admissible under the hearsay exception for statements of a party oppo-
nent. Finally, defense counsel objected on hearsay grounds to the admis-
sion of the recording of M's statements to D identifying the defendant
as the shooter. The trial court concluded, however, that M's statements
were admissible under the hearsay exception for spontaneous utter-
ances, and the recording was played for the jury. From the judgment
of conviction, the defendant appealed to this court. *Held*:

1. The defendant could not prevail on his claim that the trial court improperly
   admitted A's expert testimony about gangs on the grounds that it was
   irrelevant and a violation of his constitutional right to confrontation:

   a. The defendant abandoned his nonconstitutional, evidentiary claim that
   A's expert testimony was irrelevant; it was the defendant's burden to
   establish that the allegedly improper admission of A's testimony was
   harmful, he failed to brief that issue, and, even if the single sentence in
   his brief relevant to that issue raised an argument that A's testimony
   was more prejudicial than probative, that argument did not address
   whether any alleged error was harmful in light of all of the other evidence
   adduced at the defendant's trial.

   b. The defendant failed to preserve his claim that A's testimony violated
   his constitutional right to confrontation insofar as it was a conduit for

inadmissible, testimonial hearsay from contacts and informants who were not subject to cross-examination; defense counsel never argued before the trial court that the alleged hearsay was testimonial, as counsel challenged A's testimony only on the basis of relevancy, hearsay and prejudice, and, although the parties and the trial court might have been on notice of other constitutional claims relative to other evidence, that did not place them on notice as to this specific claim.

c. Even if A served as a conduit for testimonial hearsay, any constitutional error in the admission of A's testimony regarding gangs was harmless beyond a reasonable doubt in light of the strength of the state's case, evidence of the defendant's motive, and the cumulative nature of the witnesses' testimony: the jury reasonably could have inferred that the defendant shot the victim in retaliation for H's murder and that the shooting was gang related, as there was evidence that the defendant and H had been friends and that the victim had been arrested for the murder of H but was acquitted after a trial, which the defendant attended; moreover, the state linked the defendant to the 150 gang through the reference to 150 on his bedroom mirror and evidence that he used that number as part of his username for his Snapchat account; furthermore, the state's case was strong, as M, who had known the defendant for years, identified the defendant as the shooter within minutes of the shooting, the firearm used to shoot the victim and the sweatshirt that eyewitnesses had seen the shooter wearing were discovered near the location where the police apprehended the defendant, and testing could not eliminate the defendant as a contributor to the DNA that was found on the gun used in the shooting, which was similar to the gun that appeared in the rap music video.

2. The defendant failed to establish that any error in the admission of the rap music video was constitutional in nature, as he did not demonstrate the materiality of that evidence, especially in light of the other substantial evidence of his guilt that had been adduced at trial; moreover, the defendant's failure to brief the issue of harmless evidentiary error rendered any evidentiary claim with respect to the admission of the video abandoned.

3. The trial court did not abuse its discretion in admitting the photographs of the writing on the mirror, because, even if the writing constituted hearsay, it was admissible under the hearsay exception for statements of a party opponent: the state produced sufficient evidence from which the jury reasonably could have inferred that the defendant authored the writing on the mirror, as there was circumstantial evidence that the defendant was at least an occupant of the bedroom where the mirror was found, including documents found therein with his name and address on them, there was no evidence from which it could be inferred that a person other than the defendant resided in the apartment, and, at the time of the search by the police, the apartment was not open and no one else was present in the apartment; moreover, there was other circumstantial evidence that demonstrated the defendant authored the writings, including his initials on the mirror.

4. The trial court did not abuse its discretion in admitting the recording of M's statements to D under the spontaneous utterance exception to the hearsay rule: contrary to the defendant's assertion that M's statements were inadmissible because she had an opportunity for deliberation or fabrication, the few minutes between the shooting and her statements to D were insufficient to provide M with an opportunity to deliberate or to fabricate, especially in light of her proximity to the crime scene and her emotional state, evidenced by her crying, her rambling, and her distressed voice; moreover, it was of little significance that M's statement identifying the defendant as the shooter was in response to a question from D, as her response was a stream of consciousness that was spoken under emotional circumstances, she answered D's question regarding the shooter's identity without pause, and, although she was rambling and crying, she continued to provide D with additional information, unprompted, about what she had witnessed; furthermore, there was no evidence that J and M discussed the shooting prior to M's conversation with D, nothing J said to D, to the extent it was decipherable from the recording, identified the defendant as the shooter, and there was no evidence that M was influenced by anything she heard from J.

Argued November 18, 2020—officially released September 8, 2021*

*Procedural History*

Substitute information charging the defendant with the crimes of murder and carrying a pistol without a permit, brought to the Superior Court in the judicial district of Fairfield, where the court, *Pavia, J.*, denied the defendant's motions to preclude certain evidence; thereafter, the case was tried to the jury before *Pavia, J.*; verdict and judgment of guilty, from which the defendant appealed. *Affirmed.*

*Erica A. Barber*, assigned counsel, for the appellant (defendant).

*Kathryn W. Bare*, senior assistant state's attorney, with whom, on the brief, were *Joseph T. Corradino*, state's attorney, and *Colleen P. Zingaro* and *Michael A. DeJoseph, Jr.*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

D'AURIA, J. The principal claims in this appeal concern the propriety of the trial court's admission of evidence regarding a criminal defendant's alleged gang affiliation and, specifically, whether the prejudicial nature of this evidence outweighed its relevance. The defendant, Deonte O. Tomlinson, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a), for the shooting death of the victim, Kahlil Diaz, and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). On appeal, the defendant claims that the trial court improperly admitted the following evidence: (1) expert testimony regarding gangs because it was irrelevant and violated his right to confrontation under the federal constitution; (2) a rap music video because its highly prejudicial nature rendered his trial fundamentally unfair; (3) police photographs that depicted writing on a mirror in a bedroom of his apartment— arguably reflecting gang membership—because the photographs constituted inadmissible hearsay; and (4) portions of a recorded phone conversation that was contemporaneous with the murder because it constituted hearsay and did not fall under the excited utterance exception to the rule against hearsay. Although we recognize that evidence regarding a defendant's gang affiliation may prejudice a jury against a defendant, on the facts of this case, we affirm the judgment of conviction.

Specifically, we conclude that the defendant did not preserve at trial his claim regarding expert testimony on gangs and that, even if the testimony was improperly admitted, it was harmless beyond a reasonable doubt. We also conclude that the defendant has failed to establish that the allegedly erroneous admission of the rap music video was of constitutional magnitude. Finally, we conclude that the trial court did not abuse its discretion in admitting either the photographs of the mirror or the recorded conversation.

Relevant to our review of these claims is the following procedural history, along with the following facts the jury reasonably could have found from the evidence admitted at trial. At approximately noon on May 13, 2016, the day of the shooting, Detectives Theodore Montagna, Edward Martocchio and Albert Palatiello of the Bridgeport Police Department were driving northbound in an unmarked police vehicle on Madison Avenue in Bridgeport. At the intersection of Madison Avenue and Frank Street, Montagna saw a tall, thin, light-skinned black male wearing a black hooded sweatshirt standing in the middle of the street firing a gun with his right hand into a silver-colored vehicle. After firing three gunshots, the shooter turned away and ran eastbound down an alleyway between two residences. Palatiello exited the vehicle and ran northbound on Madison Ave-

nue, where he discovered the victim sitting in a silver-colored Audi, bleeding from his neck. The victim exited his vehicle and died at the scene from multiple gunshots wounds.

Meanwhile, Montagna drove down Madison Avenue, dropped Martocchio off halfway down the block, and parked on the corner of Grand Street and Madison Avenue, about one block from the crime scene, hoping to flush out the shooter. As Montagna proceeded on foot on Grand Street, he saw a tall, thin, black male, later identified as the defendant, exit an alleyway that ran behind a church and led to the backyard of a residence at Madison Avenue and Grand Street. The defendant was no longer wearing a black sweatshirt. Montagna yelled, "[s]top! Police!" The defendant stopped. Montagna grabbed the defendant, and, unsolicited, the defendant said, "I didn't do nothing." Montagna patted the defendant down, searching for a weapon but did not find one. Although the temperature was 61 degrees Fahrenheit and the defendant was wearing only a T-shirt and jeans, he was sweating and his heart was beating rapidly.

While Montagna detained the defendant, Officer Paul Nikola of the Bridgeport Police Department, who had been dispatched to assist in the investigation, found a knit hat, black hooded sweatshirt, and a silver-colored, semiautomatic handgun under a wooden deck in the backyard of a residence that abutted the alleyway from which the defendant had emerged onto Grand Street.

Two witnesses to the shooting were not police officers: Francisco Rivera and Alexis McIntosh. McIntosh had known the defendant since middle school and identified him as the shooter in a phone conversation recorded within moments of the shooting. Rivera, who had been waiting for a bus on Madison Avenue, witnessed the shooting but did not see the shooter's face and could describe the shooter only as tall and dressed entirely in black.

The state's theory of the case was that the defendant was a member of the "150 gang" and that the victim was a member of a rival gang known as the "Green Hollow Boyz." The victim recently had been acquitted after a trial of the murder of a member of the defendant's gang, Ryan Hernandez, and the state contended that the defendant murdered the victim in retaliation. Following a jury trial, the defendant was convicted of murder and carrying a pistol without a permit. The trial court imposed a total effective sentence of fifty-three years of incarceration. The defendant now appeals to this court. Additional facts will be set forth as necessary.

## I

The defendant claims that the trial court violated the rules of evidence and his sixth amendment right to confrontation by improperly admitting expert testi-

mony from Sergeant Jason Amato of the Bridgeport Police Department regarding local street gangs. As to his evidentiary claim, the defendant argues that, because no direct evidence established that he was a member of a gang, and, thus, no evidence established that the shooting was associated with gang violence, expert testimony regarding gangs was irrelevant. As to his confrontation clause claim, the defendant argues that Amato's testimony was a conduit for inadmissible, testimonial hearsay obtained from contacts in the community and informants who were not subject to cross-examination. The defendant contends that the state cannot demonstrate that this error was harmless beyond a reasonable doubt. The defendant's failure to brief the issue of harmfulness renders it unnecessary for us to review that claim.

As to the defendant's constitutional claim, which he did not preserve at trial, on the record before this court, we conclude that either a majority of Amato's testimony did not improperly parrot testimonial hearsay statements or the record is inadequate to make that determination. We further conclude that any error by the trial court in permitting Amato to serve as a conduit for testimonial hearsay was harmless beyond a reasonable doubt.

A

The following additional facts and procedural history are necessary to our review of these claims. Prior to trial, the defendant filed a motion in limine to exclude evidence of his association with the 150 gang pursuant to the fifth, sixth and fourteenth amendments to the federal constitution, as well as §§ 4-1, 4-3, 4-5 and 8-2 of the Connecticut Code of Evidence. His supporting memorandum of law, however, contained no constitutional analysis, arguing only that Amato's expert testimony regarding gangs was irrelevant because there was no evidence that the defendant belonged to a gang.

Before the start of evidence, the trial court held a hearing on the defendant's motion in limine. Amato testified that he was the gang intelligence sergeant for the city of Bridgeport. After testifying as to his experience and training, Amato explained that his duties required him to acquire information provided by community members and gang members. When talking to gang members, he would meet with them in an isolated area to obtain pertinent information about gangs, the meaning of signs and symbols that they use, areas of the city that they control, and crimes that had been committed.

Amato also testified that he was familiar with both the 150 gang and the Green Hollow Boyz, as well as with the defendant and Hernandez. He testified that Hernandez had been a member of the 150 gang and that the basis for his opinion included Hernandez' portrayal

of himself in videos and other materials, along with information from sources in the community.[1] The victim and Fabian Francis, who were members of the Green Hollow Boyz, had been arrested and charged with Hernandez' murder but were acquitted after trial. Amato also was familiar with Tajvon Ferris and Kevin Beason through "several contacts," including "[i]nformation provided through people on the street that they were a part of a—they were part of the 150 [gang]. And we had made contacts on the street with them." Amato learned through informants and social media that the defendant was associated with Ferris and Beason, and with the 150 gang.

Amato then testified that, as part of his duties, he monitored social media to keep an eye on the gangs and to learn more about them. This was how he discovered a rap music video depicting the defendant, Ferris, and Beason. Based on what others had told him, Amato was able to interpret the video's lyrics, including that the use of "G" in the video meant the Green Hollow Boyz.

Based on his experience as a gang intelligence sergeant and his investigation of shootings in the city, including that of the victim, Amato opined that, at the time of the victim's death, there was a conflict between the 150 gang and the Green Hollow Boyz, and that Hernandez' homicide and the acquittal of the victim and Francis contributed to this conflict. He stated that his knowledge of which gangs controlled which areas of the city was based not just on what community residents, informants, and gang members had told him, but on his own observations and experiences.

Amato conceded that the defendant never told him that he was involved in a gang. Rather, Amato's opinion that the defendant was "100 percent part of [the] 150 [gang]" was based on "information we receive through sources, videos, [and] photographs, other information through the years," and that other police officers had told him that the defendant had been involved in other gang related crimes. For example, he testified that the rap music video he had discovered evidenced an association between the three men, referred to issues involving another area gang, and exhibited access to a "community weapon," which he described as a weapon hidden by a gang in a certain location that can be accessed and used by any member of that gang who needs a firearm, after which the firearm is to be returned to the same hidden location for use by other members of the gang. He clarified that he learned about community weapons from his debriefing of gang members and through his experience.

Following Amato's testimony at the pretrial hearing, defense counsel argued that this testimony was inadmissible because Amato admitted that he was basing his opinions on hearsay and that, as an expert witness, Amato was not allowed to parrot hearsay. The court

made "a finding that . . . in this particular instance . . . the expert's testimony is based on evidence that has been gained through many years of experience, through many courses that have been taken, through sources that are reliable, and, therefore, it's going to be a question of weight, not admissibility." The court made clear, however, that it was making a preliminary ruling and that the parties should raise additional objections at trial based on the evidence that was admitted. For example, the court stated that, if there was no evidence that the defendant was a member of the 150 gang, Amato's expert testimony could be ruled irrelevant and inadmissible.[2]

Prior to the start of Amato's testimony at trial, defense counsel accepted the court's invitation and again objected to his testimony, arguing that there had been, to that point, no nonhearsay evidence admitted showing that the defendant was a member of the 150 gang. The trial court adhered to its prior ruling and overruled the objection that all expert testimony regarding gangs was irrelevant. The court clarified that Amato could testify that 150 is a known gang but not that the defendant was a member of the 150 gang or what was meant by the "150" in his Snapchat address and on his bedroom mirror. The court stated that the jury could instead infer any link between the defendant and the 150 gang.

Amato's testimony before the jury was considerably shorter than what the state had presented at the pretrial hearing. After describing his training and experience, Amato testified that, as the city's gang intelligence sergeant, he was "responsible for any gang related activity, shootings, assaults, identifying and tracking gang intelligence . . . . [T]hen we . . . share [it] with other units in the city." He testified that, as part of his duties, he gathered intelligence from many sources, including social media, the Internet, and contacts within the community. Amato explained that gangs in Bridgeport are unique; they are not organized but, instead, are neighborhood based with certain gangs controlling different areas of the city based on where the members are from. Amato repeated that portion of his pretrial testimony in which he indicated that he knew Hernandez through contacts in the community and that Hernandez went by the nickname, or street name, "Ryo." Amato learned through the course of his employment that Hernandez had been fatally shot and that Francis and the victim had been arrested in connection with the shooting but were later acquitted after trial.

The prosecutor then asked Amato if he was aware of the motive behind the murder of Hernandez, to which he responded in the affirmative, leading defense counsel to object on the ground of hearsay. Amato then explained that the basis for his knowledge included community contacts, firsthand knowledge from investigating the defendant's case and his work as a police

officer in general, which included a long-term investigation into a rival gang. The trial court overruled defense counsel's objection.[3]

Amato proceeded to testify, as he did at the pretrial hearing, that the motive underlying the homicide of Hernandez was gang related, that Hernandez had been affiliated with the 150 gang, which also was known as the Park Avenue Boyz (PAB), and that Francis and the victim were affiliated with the rival Green Hollow Boyz gang. Amato stated that his testimony was based on his long-term investigation of neighborhood gangs in Bridgeport, each of which controlled its own section of the city. He testified that he had firsthand knowledge that, in 2016, there had been a conflict between the 150 gang and the Green Hollow Boyz, and that, based on information he had gathered at various shooting incidents in Bridgeport, he arrived at his opinion that there was a war between these two gangs. He opined that the murder of Hernandez contributed to this conflict and that, based on information he obtained through "contacts on the street, using confidential informants," "[the conflict] was gonna continue, and it was only gonna get worse."

Based on his training, Amato also testified that an individual seeking to identify his association with the 150 gang would assign himself either a name or a symbol, using the number 150 or PAB. Similarly, someone affiliated with the Green Hollow Boyz would use "G-B" or "G$B."

Amato testified that he knew the defendant, Ferris, and Beason from prior contacts, with Ferris going by the nickname "T Raw," Beason going by "KB," and the defendant going by "DT." He explained that, prior to the shooting at issue, he had discovered a rap music video depicting the defendant, Ferris, and Beason. Defense counsel again objected when the state sought to admit the rap video into evidence, stating simply that he maintained his prior objections.

Before the video was played for the jury, Amato testified that he was familiar with the term "community weapon" through his training and experience, and described it is "a firearm that's passed amongst the gang members or group members from that one area." Using a screenshot from the rap video, Amato identified the defendant, Ferris, and Beason. The video was subsequently played for the jury. Amato was not permitted to interpret what was said in the video.[4]

In closing arguments to the jury, the prosecutor argued that, as to motive, Hernandez and the defendant were associated with each other and that the victim was shot only a few months after being acquitted of Hernandez' murder. The prosecutor further argued that there was an ongoing feud between the 150 gang and the Green Hollow Boyz. The prosecutor never specifically

argued that the defendant was a member of the 150 gang or that the shooting of the victim was gang related. The prosecutor suggested this, however, by relying on the testimony of both McIntosh and Amato to argue that the shooting occurred in an area of the city that was not controlled by the 150 gang but by the Green Hollow Boyz, with which the victim had been associated, and that the defendant's presence in that area was not normal. The prosecutor also noted that the rap music video and the defendant's Snapchat name contained the number 150 but left the jury to draw its own inferences and conclusions from this fact. The prosecutor specifically argued, without objection from the defendant, that the shooting of Hernandez, in which the state had implicated the victim, was part of the feud between the two gangs.

Neither party timely requested that the court give the jury an instruction on motive or any limiting instruction regarding Amato's testimony. The court, however, did instruct the jury, without objection from the parties, regarding expert testimony in general, consistent with the model jury instructions on the Judicial Branch website. See Connecticut Criminal Jury Instructions 2.5-1, available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited September 8, 2021).

B

The defendant first asserts that Amato's expert testimony was inadmissible because it was irrelevant. Specifically, he argues that, because there was no direct evidence that he was a member of the 150 gang, this evidence was not relevant to motive, that is, that he killed the victim, who was a member of a rival gang, in retaliation for the victim's allegedly having murdered Hernandez, who had been the defendant's friend and a fellow gang member. The defendant does not argue, however, that this alleged evidentiary error was harmful.[5] Accordingly, we deem this claim of evidentiary error abandoned and decline to address it.

We have stated that, if the improper admission of expert opinion testimony "is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Beavers*, 290 Conn. 386, 419, 963 A.2d 956 (2009). The defendant argues in a single sentence in his principal brief that, by utilizing Amato's allegedly irrelevant testimony, "the state played to the [jurors'] fears and unduly prejudiced the defendant; that is, it raised and perpetuated the specter of the young, violent, inner city African-American male as associating with and engaging in the most negative of stereotypes." Even if this single sentence sufficed to raise an argument that the testimony was inadmissible because it

was more prejudicial than probative, the argument does not address whether any alleged error was harmful in light of all the other evidence. See *State* v. *Toro*, 172 Conn. App. 810, 818–20, 162 A.3d 63 (explaining that, although prejudice and harm may overlap, they are separate and distinct issues requiring separate analysis), cert. denied, 327 Conn. 905, 170 A.3d 2 (2017). Because it was the defendant's burden to establish harm from any evidentiary error; see *State* v. *Beavers*, supra, 419; and because he failed to brief the issue of harmful error, we deem this claim abandoned and decline to address it.[6] See *State* v. *Kirsch*, 263 Conn. 390, 412, 820 A.2d 236 (2003) ("to establish reversible error on an evidentiary impropriety, the defendant must prove both an abuse of discretion and a harm that resulted from such abuse"); *State* v. *Toro*, supra, 818–20 (evidentiary claim was abandoned when defendant did not brief issue of whether admission of evidence constituted harmful error).

C

The defendant also claims that the admission of Amato's expert testimony was improper because it violated his sixth amendment right to confrontation. Specifically, he argues that Amato's testimony was a conduit for inadmissible, testimonial hearsay obtained from contacts and informants who were not subject to cross-examination.

First, we must decide whether the defendant properly preserved this claim. He argues that he raised this claim at trial because, (1) in his motion in limine to exclude evidence regarding any alleged association with the 150 gang, he stated that he sought to exclude this evidence pursuant to the fifth, sixth, and fourteenth amendments to the federal constitution, (2) he argued at trial that Amato, as an expert witness, could not merely repeat hearsay from witnesses and informants, (3) he raised this claim in his motion for a new trial, and (4) the trial court recognized the constitutional implications of admitting other hearsay reliant testimony, and, thus, the trial court and the state were on notice of his claim. The record does not support the defendant's arguments.

Although, in his motion in limine, the defendant cited to the sixth amendment, he never distinctly claimed that he was raising a confrontation clause claim; nor did he advance any argument that Amato's testimony was a conduit for *testimonial* hearsay. Rather, he argued only that Amato's testimony was irrelevant. Additionally, at trial, his argument regarding the admissibility of this evidence was limited to hearsay and prejudice. Although, as we will discuss subsequently, hearsay is one component of a confrontation clause claim, it is not the equivalent of a confrontation clause claim, which requires the defendant to establish that he did not have an opportunity to cross-examine a declarant regarding a testimonial, hearsay statement. See, e.g., *State* v. *Walker*, 332 Conn. 678, 700–701, 212

A.3d 1244 (2019) (defendant must establish that challenged statement was both hearsay and testimonial in nature). The defendant never argued that the alleged hearsay was testimonial. In his motion for a new trial, the defendant raised only hearsay and prejudice challenges to Amato's testimony. Finally, the fact that the parties and the trial court might have been on notice of other constitutional claims in relation to other evidence offered at trial did not place them on notice of this specific claim. Alerting the trial court and the state to this particular claim at trial is important in creating a proper record for appellate review. We conclude that the defendant did not preserve this claim at trial and that we may review it only pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).

Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis omitted; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40. Because this court previously has not had the opportunity to address a confrontation clause claim in relation to expert testimony regarding gangs, we first briefly address how trial courts should treat such testimony. Having reviewed the entire record in the present case, however, we determine that any possible error in admitting Amato's testimony was harmless beyond a reasonable doubt, and, thus, the defendant's claim fails on the fourth prong of *Golding*.

1

Although our recent discussion of testimonial hearsay in *Walker* did not pertain to expert testimony regarding gangs, we stated that "testimonial hearsay is admissible against a criminal defendant at trial only if the defendant had a prior opportunity for cross-examination and the witness is unavailable to testify at trial. . . . Accordingly, the threshold inquiries in a confrontation clause analysis are whether the statement was hearsay, and if so, whether the statement was testimonial in nature . . . . These are questions of law over which our review is plenary." (Citations omitted; internal quotation marks omitted.) *State* v. *Walker*, supra, 332 Conn. 689–90. Testimonial hearsay includes statements made under circumstances that "would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . ." (Internal quota-

tion marks omitted.) Id., 701.

We recognize that "[s]pecial considerations arise under the [c]onfrontation [c]lause in the context of expert testimony." *United States* v. *Garcia*, 793 F.3d 1194, 1212 (10th Cir. 2015), cert. denied, 577 U.S. 1088, 136 S. Ct. 860, 193 L. Ed. 2d 758 (2016). Although an expert may rely on hearsay in reaching an opinion, the expert may not place the underlying hearsay before the jury for its truth. See Conn. Code Evid. § 7-4 (b); see also *State* v. *Lebrick*, 334 Conn. 492, 527, 223 A.3d 333 (2020); *State* v. *Walker*, supra, 332 Conn. 691–93; cf. *Milliun* v. *New Milford Hospital*, 310 Conn. 711, 726–27, 80 A.3d 887 (2013) (civil case; no confrontation clause issue), overruled in part on other grounds by *DeMaria* v. *Bridgeport*, 339 Conn. 477, 261 A.3d 696 (2021).

Both our Appellate Court and the United States Courts of Appeals have applied these legal principles to expert testimony regarding gangs and other criminal associations, holding that this testimony does not implicate the confrontation clause, even if the expert relies on hearsay—testimonial or otherwise—in reaching an opinion, as long as certain circumstances are present and precautions are observed. To begin with, it is necessary that the expert apply his or her training and experience to the information to reach an independent judgment and does not merely parrot another individual's out-of-court statement for its truth, thereby serving as a conduit for an otherwise inadmissible hearsay statement. See, e.g., *United States* v. *Garcia*, supra, 793 F.3d 1212–13; see also *United States* v. *Rios*, 830 F.3d 403, 417–18 (6th Cir. 2016), cert. denied sub nom. *Casillas* v. *United States*, U.S. , 137 S. Ct. 1120, 197 L. Ed. 2d 220 (2017), and cert. denied, U.S. , 138 S. Ct. 2701, 201 L. Ed. 2d 1096 (2018); *United States* v. *Vera*, 770 F.3d 1232, 1239–40 (9th Cir. 2014); *United States* v. *Palacios*, 677 F.3d 234, 243–44 (4th Cir.), cert. denied, 568 U.S. 834, 133 S. Ct. 124, 184 L. Ed. 2d 59 (2012); *United States* v. *Mejia*, 545 F.3d 179, 197 (2d Cir. 2008); *United States* v. *Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2003), cert. denied sub nom. *Griffin* v. *United States*, 541 U.S. 1092, 124 S. Ct. 2832, 159 L. Ed. 2d 259 (2004); *United States* v. *LoCascio*, 6 F.3d 924, 937–38 (2d Cir. 1993), cert. denied, 511 U.S. 1070, 114 S. Ct. 1646, 128 L. Ed. 2d 365 (1994), and cert. denied sub nom. *Gotti* v. *United States*, 511 U.S. 1070, 114 S. Ct. 1645, 128 L. Ed. 2d 365 (1994); *State* v. *Crocker*, 83 Conn. App. 615, 634–35, 852 A.2d 762, cert. denied, 271 Conn. 910, 859 A.2d 571 (2004); *State* v. *Henry*, 72 Conn. App. 640, 656–58, 805 A.2d 823, cert. denied, 262 Conn. 917, 811 A.2d 1293 (2002). For example, if the expert explicitly refers to or vouches for the accuracy of the underlying hearsay statement, the confrontation clause is implicated, as "expert witnesses cannot be used as conduits for the admission into evidence of the testimonial statements of others." *State* v. *Walker*, supra, 332 Conn. 695. Additionally, the level of specificity contained in the

hearsay statement must also be considered. "An important consideration in distinguishing proper testimony from parroting is the generality or specificity of the expert testimony. . . . [W]hen [gang expert] testimony descends to a discussion of specific events recounted by others, the expert is merely adding unmerited credibility to the sources . . . and summarizing evidence in a way that should be reserved for the government's closing argument." (Citation omitted; internal quotation marks omitted.) *United States* v. *Garcia*, supra, 1213; see also *United States* v. *Mejia*, supra, 194–95.[7] It also is important to ensure that the expert is utilizing the hearsay testimony for the purpose of applying to that testimony his particular area of expertise. See, e.g., *United States* v. *Dukagjini*, supra, 326 F.3d 59 ("[w]henever a court permits a case agent or a fact witness to testify as an expert, there is a significant risk that, if the witness digresses from his expertise, he will be improperly relying [on] hearsay evidence and may convey hearsay to the jury").[8]

### 2

Even if we assume that Amato served as a conduit for testimonial hearsay, however, we conclude that this error was harmless beyond a reasonable doubt.[9] Because the defendant's claim is constitutional in nature, the state bears the burden of establishing that this alleged error was harmless beyond a reasonable doubt.[10] See, e.g., *State* v. *Edwards*, 334 Conn. 688, 706–707, 224 A.3d 504 (2020). "That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]. . . . Additional factors . . . include the importance of the challenged evidence to the prosecution's case, whether it is cumulative, the extent of cross-examination permitted, and the presence or absence of corroborating or contradicting evidence or testimony." (Citation omitted; internal quotation marks omitted.) Id., 707.

The following additional facts are relevant to our harmless error analysis. The state presented the testimony of two eyewitnesses. Rivera, who had been waiting at a bus stop on Madison Avenue just before noon on the day of the shooting, testified that he saw a tall man dressed entirely in black point a gun into a car and then heard gunshots. More incriminating, however, was the testimony of McIntosh, who had known the defendant since middle school, had seen him two to three weeks prior to the shooting, and, also prior to the shooting, had had contact with him on Snapchat where his username was "Hotboy150." She testified that, at approximately noon on the day of the shooting, she was in a vehicle operated by Kadeija Johnson on Madison Avenue. At that time, the two women were discussing whether Johnson had made a wrong turn. McIntosh saw the defendant, whom she knew as "DT," walking across the street with his hands in his pockets

and then heard gunshots as she turned her head away from him. She recognized the defendant by his height, skin tone, and facial expression—he was biting his lip—and was surprised to see him in this area of the city because he was not from that side of the city.

After the gunshots, Johnson made a U-turn to return to the scene to see what had happened. McIntosh then saw the victim exit his vehicle, bleeding from the neck. During these events, Johnson had been on the phone with her then boyfriend, Richard Davis. Because Davis was incarcerated, the conversation was recorded by the correctional facility. Within minutes of the shooting, McIntosh also spoke with Davis and told him that the defendant was the shooter.

At trial, McIntosh testified that she was not certain that the shooter was the defendant because she had not been wearing her glasses in the car. The state refreshed McIntosh's recollection with a statement she had made to the police. In that statement, McIntosh said that she actually saw the defendant pull out a silver-colored gun and shoot the victim while the defendant was standing in the middle of the street and that she was 100 percent certain that the defendant was the shooter. She also told the police that she was able to see this despite not wearing her glasses at the time. At trial, however, she sought to clarify that she did not see the shooting or the defendant with a gun but, rather, saw something silver-colored in his hand and thought it was a cell phone but, after hearing the gunshots, assumed it was a gun. She also testified that she told the police that she was certain that the shooter was the defendant only because she had seen a video on social media about his arrest. She claimed at trial that she was only 60 to 70 percent certain it was he until then, and she did not want to get involved unless she was certain.

The court then admitted into evidence a portion of the recording of McIntosh's conversation with Davis under the spontaneous utterance exception to the rule against hearsay to show that she had been certain of the shooter's identity at the time of the shooting and had in fact witnessed the shooting and seen the gun. The jury reasonably could have concluded that the recording stated:

"[Q]. Hello? Who shot him?

"[A]. No. I seen his face. He was light-skinned. He had on a hoodie. He had on all black.

"[Q]. He tall?

"[A]. Yes. He's tall. He's like a little taller than Kai yo.

"[Q]. DT?

"[A]. I swear to god it looked just like DT because I was looking and I seen his face yo, and I was like I know that's not DT. Pulled out a gun and he fired. I swear to god Pooh Bear, it looked like DT, and I looked

right in his face. I looked right in in his face, and I said that looked like DT. I seen him pull out something silver. I can't see far with my glasses."

In the recording, McIntosh was clearly emotional, her words broken up by sobs and crying. After the recording was played for the jury, McIntosh clarified that, when she exclaimed to Davis, "I know that's not DT," she did not mean that she was uncertain as to the identity of the shooter but that she was surprised by his presence in that area of town and shocked by what she had witnessed.

In addition to the testimony of Rivera and McIntosh, the state offered the testimony of the three detectives who had been driving to lunch on Madison Avenue at the time of the shooting, Martocchio, Montagna, and Palatiello. Because they were going for lunch, none of the detectives had their handcuffs or bulletproof vests with them, although they had their service revolvers and police radios. Montagna, who was driving the car, testified that he stopped at a stop sign on Frank Street, which intersected with Madison Avenue. Montagna testified that, although another vehicle was in front of them at the stop sign, he could see clearly up Madison Avenue. While the detectives were stopped, Montagna saw a black male wearing a dark colored, hooded sweatshirt in the middle of the road firing a gun with his right hand into a silver-colored vehicle before running from the scene on Madison Avenue and through a backyard toward Grand Street. At that time, Palatiello got out of the vehicle[11] and Martocchio announced over the police radio that gunshots had been fired. Montagna drove down the street a little farther, letting Martocchio out midblock before parking and exiting the vehicle at the corner of Madison Avenue and Grand Street (one block away from the shooting) to search the backyards in the hope of flushing out the shooter. This all occurred within twenty to thirty seconds of the shooting.

Montagna then walked down Grand Street with his service revolver drawn, searching for the shooter. He described the shooter over the police radio as a tall, thin, black male. Within two minutes, as Montagna proceeded down Grand Street, the defendant appeared out of an alleyway. Montagna immediately yelled for the defendant to stop and identified himself as a police officer. The defendant, who stopped, looked similar to the shooter but was wearing a T-shirt rather than a sweatshirt. Montagna testified that the defendant said that he did not do anything, although Montagna had not asked a question. Montagna determined that the defendant was unarmed but was sweating and had a rapid heartbeat. Montagna was not certain whether the defendant was the shooter, but the defendant was similar to the shooter in terms of weight, thinness, height, and skin tone (light-skinned black man).

At this time, no one else was in the area, and, because

Montagna did not have handcuffs with him, he held onto the back of the defendant's pants and waited for another officer to arrive. Montagna did not want to let go of the defendant to make any announcement on the police radio. He held onto the defendant for about one minute before Sergeant Joel Carly arrived in a police vehicle. The defendant was then placed in the back of Carly's vehicle. After securing the defendant, Montagna searched for the weapon in a backyard near the area from which the defendant had emerged onto Grand Street. At this time, Nikola, who was assisting in the investigation, also was searching this area. When Montagna did not discover anything in the yard, he walked back to Carly and discussed what steps to take next. Nikola then called Montagna over and said that he had found a gun, a hooded sweatshirt, and a knit hat underneath a deck in the backyard abutting the alleyway from which the defendant had emerged onto Grand Street. The sweatshirt was similar to the one that the shooter had been wearing. Only after Nikola discovered these items, approximately eight minutes after the gunshots were reported, was it announced over the police radio that a suspect had been detained.

As to physical evidence, the state offered DNA evidence showing that the defendant had been eliminated as a contributor to DNA samples that were taken from the cuff, zipper pull, and pocket areas of the hooded sweatshirt. DNA testing on the armpit of the hooded sweatshirt was inconclusive regarding the defendant. He was included, however, as a contributor to a mixed DNA sample on the knit hat. In addition, although an initial laboratory test eliminated the defendant as a contributor to the DNA sample from the firearm, later testing showed that no comparison could be drawn because of the large number of contributors found in the DNA sample from the firearm.

Samples from the hooded sweatshirt also showed that Beason was a contributor to the mixed DNA sample and that Ferris was a major contributor. Ferris also was a major contributor to the DNA sample from the knit hat. To explain this DNA evidence, the state offered evidence that the defendant was associated with Beason and Ferris. Additionally, the state offered testimony from Latia Steadman, an acquaintance of Beason, that he had borrowed her vehicle on the day of the shooting, and video surveillance evidence showed that this vehicle was near the crime scene at the time of the shooting.

The state also offered testimony from Fung Cso Kwok, a state forensics examiner and an expert in gunshot residue. He testified that gunshot residue is comprised of three elements—lead, antimony, and barium—and that two of these elements (lead and barium) were found in samples taken from the right side of the defendant's pants. Such findings were consistent with gunshot residue. Additionally, lead was found on samples

taken from the defendant's left and right palms, and from the back of his right hand. These findings are commonly associated with gunshot residue. Kwok explained that the amount of gunshot residue that lands on a shooter and the presence of all three elements can be affected by wind or by the shooter moving or wiping his hands. The evidence demonstrates that the defendant was outdoors at the time of the shooting, had been running prior to being detained, and had removed his sweatshirt, from which the jury reasonably could have inferred that the gunshot residue may have been removed or affected.

Regarding the firearm specifically, the state offered testimony from Marshal Robinson, a firearms examiner, that the firearm discovered under the deck close to where the police apprehended the defendant was the gun from which the bullets that struck the victim were shot. Additionally, Robinson testified that the gun discovered near the scene was similar to a gun depicted in the rap music video that featured the defendant, Beason, and Ferris. The gun in the video and the gun discovered hidden under the deck both had similar floor plates, finger extensions, and trigger shape. Both guns appeared to be .380 automatics. Although only Beason and Ferris were seen holding the gun in the video, the prosecutor argued to the jury that some aspects of that gun were similar to the gun used to shoot the victim and that this was evidence that the defendant had access to the gun. Additionally, the DNA evidence showed that numerous people had touched the gun and, thus, no comparison could be drawn. From all of this, the jury reasonably could have inferred that the defendant had access to the gun used to shoot the victim.

As to motive, besides Amato's challenged testimony, the state offered evidence that the defendant and Hernandez had been friends. Additionally, there was unchallenged testimony that the victim had been arrested for the murder of Hernandez but was acquitted after a trial. Maya Oquendo, the mother of the victim's son, testified that the defendant had attended the victim's trial, although she could not recall if he had been present for the verdict.

From this evidence, we conclude that the state has established that any error in admitting the challenged evidence was harmless beyond a reasonable doubt. Multiple witnesses testified about the relationship between the defendant and Hernandez, and the facts underlying Hernandez' death. The jury reasonably could have inferred from the defendant's presence at the victim's trial that he knew that the victim had been acquitted. From this, even without Amato's testimony regarding the motive underlying the Hernandez homicide and gang affiliation, the jury reasonably could have inferred that the defendant shot the victim in retaliation for his friend's death. Although there was no other direct

evidence that the Hernandez homicide was gang related, such evidence was not necessary to establish a motive for the shooting at issue, about which Amato did not testify. The jury also reasonably could have inferred from other evidence that the shooting at issue was gang related. Specifically, the state linked the defendant to the 150 gang through circumstantial evidence—the reference to 150 on his bedroom mirror and in his Snapchat username, as well as McIntosh's testimony that he was not from the part of the city where the shooting occurred. To the extent Amato's testimony bolstered the state's theory regarding motive, or that its exclusion would have diminished that theory, we note that the state is not required to establish motive, which is not an element of either of the offenses with which the defendant was charged. See *State* v. *Wilson*, 308 Conn. 412, 430, 64 A.3d 91 (2013).

Moreover, the state's case against the defendant was strong. Within moments of the shooting, while under the stress and emotional strain of having witnessed the shooting, McIntosh, who had known the defendant for years, identified him as the shooter. See part IV of this opinion. Additionally, although the announcement over the police radio that the defendant had been apprehended was not made until approximately eight minutes after the shooting, the reporting was delayed; the defendant had been detained within minutes of the shooting. Montagna observed while detaining him that the defendant was sweating and that his heart was beating rapidly, as if he had been running. The firearm used to shoot the victim, along with a black hooded sweatshirt, which was consistent with the sweatshirt eyewitnesses had seen the shooter wearing, was discovered hidden under a deck in a backyard near where the defendant was apprehended. Although the DNA evidence was not conclusive, the defendant's DNA could not be excluded from the DNA samples taken from these items. Additionally, the DNA of two of the defendant's associates, Beason and Ferris, was found on these items or could not be excluded from the DNA samples taken from them. There also was evidence that the defendant had access to the gun, which was similar to the gun that appeared in the rap music video. Although there was not a match between the DNA on the gun and that of the defendant, two of the three elements of gunshot residue were discovered on the defendant's pants.

Nevertheless, the defendant points to the following flaws in the state's case: (1) McIntosh spoke to the police only after seeing a video on social media about the defendant's arrest; (2) analysis of the DNA evidence found on the gun excluded the defendant as a contributor; (3) DNA evidence suggested that Ferris or Beason was the shooter; and (4) the defendant presented evidence that he was left-handed but that the shooter was right-handed. It is true that McIntosh's testimony was equivocal. The state, however, offered strong evidence

that, at the moment of the shooting, McIntosh identified the defendant as the shooter before she had time to contemplate what she had seen. See part IV of this opinion. As to the DNA evidence regarding the gun, it is not accurate to say that the defendant was excluded as a contributor. Rather, in the initial test conducted, he was excluded as a contributor to the DNA on the gun, but more modern, recent testing showed that he could not be excluded as a contributor because there were too many contributors to the DNA sample. This evidence, combined with the rap music video depicting Beason and Ferris holding a similar gun, supported the state's argument that the defendant had access to the gun that shot the victim. As for the DNA evidence suggesting that Ferris or Beason was the shooter, the state also offered evidence to explain the presence of their DNA—that they were associates of the defendant, with Beason possibly serving as the getaway driver. The state based this argument on video surveillance evidence from the time of the shooting that showed the vehicle Beason used that day near the crime scene. Last, as to the evidence that the defendant was left-handed, the defendant offered only testimony from Detective Jorge L. Cintron of the Bridgeport Police Department, who stated that he saw the defendant sign a piece of paper with his left hand but that the writing looked more like a scribble than a signature. Thus, the defendant's evidence in this regard was weak.

Accordingly, in light of the strength of the state's case, the other evidence of motive, and the cumulative nature of the testimony, we conclude that any error in the admission of Amato's testimony was harmless beyond a reasonable doubt.

II

The defendant next claims that the trial court deprived him of a fair trial in violation of his due process rights under the federal constitution by improperly admitting the rap music video in which he was featured along with Ferris and Beason because (1) it contained inadmissible hearsay, (2) lacked any nexus to the charged offenses, and (3) was unduly prejudicial. The defendant argues that the state is not able to show that this error was harmless beyond a reasonable doubt. The state responds that the rap music video (1) was properly admitted as an adoptive admission of a party opponent under § 8-3 (1) (B) of the Connecticut Code of Evidence, (2) was relevant to establishing the defendant's motive, his access to a gun, his association with the 150 gang, and his association with Beason and Ferris, whose DNA was also found on the hooded sweatshirt and hat, and (3) was not more prejudicial than probative. The state thus argues that any error was not of constitutional magnitude and that, to the extent admission of the video was improper, it was the defendant's burden to establish harm.

We agree with the state that the defendant has failed to establish that this alleged error was constitutional in nature. We also agree with the state that it was the defendant's burden to establish harm, and, therefore, even if we assume that the trial court improperly admitted the video, the defendant's failure to brief the issue of harmless evidentiary error renders any evidentiary claim abandoned. Nevertheless, we acknowledge the potential for the prejudicial use of evidence depicting or describing gratuitous violence or playing on potential juror biases—whether contained in a rap music video or any other type of evidence—and encourage defendants to request, and trial courts to undertake, measures to mitigate any prejudice. Because the defendant did not request these measures in the present case, however, we cannot conclude that any alleged error was constitutional in nature.

The following additional facts and procedural history are relevant to our resolution of this claim. At trial, Amato testified that, as part of his work as a police officer, he monitors social media to collect intelligence on the different gangs in the city. Amato testified that, prior to the shooting at issue, in March, 2016, he discovered a rap music video on the Internet. There are three individuals depicted in the video, whom Amato identified as the defendant, Beason, and Ferris, all of whom he had contact with previously. Amato downloaded the video the same day he discovered it and transferred it to a computer storage device on May 13, 2016. The video is titled "DT the Gawd X Trawobe—Purp Shot @JayYoung56."

The video features the defendant, Beason, and Ferris rapping, surrounded by graffiti, alcohol, and a gun. Because of the quality and clarity of the audio, the lyrics are difficult to decipher at times. The jury reasonably could have concluded, however, that the lyrics included profanity and referenced narcotics, firearms, shootings, robberies, and threats to the police. The jury also reasonably could have concluded that the lyrics referenced "Ryo," which was Hernandez' street name. In the video, both Beason and Ferris hold the gun, but the defendant is never seen holding the gun. Toward the end of the video, the screen displays the Snapchat symbol (the outline of a ghost inside a yellow square) with the username "Hotboy 150" next to the symbol. There was testimony at trial that Hotboy 150 was the defendant's Snapchat username.

Before trial, the defendant moved in limine to exclude the rap music video in its entirety on the grounds that it violated his due process right to a fair trial and was inadmissible as irrelevant and prejudicial under §§ 4-1 and 4-3 of the Connecticut Code of Evidence. Following an evidentiary hearing, the trial court heard oral argument. The defendant argued that the video was irrelevant because he never held the gun in the video and

that, because it was not clear that the gun in the video was real and operable, the video did not show that he had access to a gun and, therefore, the means to shoot the victim. He further argued that the video was not relevant to motive because, to the extent the video referred to the 150 gang, that evidence was inadmissible hearsay. Finally, he argued—without specificity—that the video was more prejudicial than probative. The state argued that the audio of the video was admissible as an adoptive admission because the defendant could be seen singing the words. The state further argued that the video was relevant to show that the defendant had access to a gun that looked similar to the gun used to shoot the victim; see part I C 2 of this opinion; and that the jury could decide for itself whether the gun in the video was real. The state also argued that the video was relevant to establishing motive based on the references in it to "Ryo" and the 150 gang, and to show an association between the defendant, Beason, and Ferris, which was germane to explaining the presence of the DNA of all three men on items found at the crime scene. The state noted that, because the defendant sought to exclude the entire video, it was seeking to have the entire video admitted.

The trial court issued a preliminary ruling, noting that it could change depending on the evidence admitted at trial. The court ruled that the video was relevant to identifying the defendant and to showing his association with the gang, and the relationship between the defendant, Beason and Ferris to the extent this friendship was significant to other evidence. The court also ruled that, although the video did not show the defendant holding the gun, the gun's depiction was relevant to show his proximity to the weapon, its availability to him, and his familiarity with this type of weapon. The trial court did not find the video overly prejudicial because the defendant was not actually holding the gun. Finally, the trial court held that the audio of the video constituted an adoptive admission by the defendant because he had voluntarily participated in the video. Nevertheless, the trial court offered to give a limiting instruction to the jury if the defendant requested one, which he did not at that time.

At trial, the state sought to admit the rap video through Amato. Again, defense counsel objected, stating simply that he was maintaining his prior objections, which the trial court overruled without additional comment. The video was played for the jury. Amato identified the defendant, Ferris, and Benson in the video while admitting that he did not know who had made the video, the video's title, or that portion of the video that showed the Snapchat usernames. The trial court again offered to provide a limiting instruction to the jury regarding the video, but the defendant did not request one.

In its closing argument, the state relied on this video to argue that the defendant had a relationship with Beason and Ferris. This was significant for two reasons: (1) their DNA was discovered on the hooded sweatshirt and hat that was found near the location where the defendant was apprehended, and (2) according to the state's theory of the case, Beason was near the scene of the crime in a borrowed vehicle and acted as the getaway driver. The state further argued that this video showed the defendant's connection to the 150 gang and that the defendant had access to a gun similar to the gun Nikola found in the backyard abutting the alleyway where the defendant was discovered. The state did caution the jury that it was not using the video "just to show people in a bad light or—or anything like that, or, hey, look, they're in a rap video; we must, you know, they must be guilty of something. It's got nothing to do with that. You know what it has to do with; there's important things about this video that we should consider in light of everything here."

Notably, the defendant does not raise an evidentiary claim but, rather, only a constitutional claim.[12] "Generally, the admissibility of evidence is a matter of state law and unless there is a resultant denial of fundamental fairness or the denial of a specific constitutional right, no constitutional issue is involved." (Internal quotation marks omitted.) *State* v. *Flanders*, 214 Conn. 493, 500–501, 572 A.2d 983, cert. denied, 498 U.S. 901, 111 S. Ct. 260, 112 L. Ed. 2d 217 (1990). "This is consistent with federal jurisprudence, which recognizes that an evidentiary error may be of constitutional magnitude if the error was so pervasive as to have denied [the defendant] a fundamentally fair trial . . . . [T]he standard . . . [is] whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short it must have been crucial, critical, [and] highly significant . . . ." (Internal quotation marks omitted.) *State* v. *Turner*, 334 Conn. 660, 674, 224 A.3d 129 (2020). It is the defendant's burden to establish that an alleged evidentiary error is of constitutional magnitude. See *State* v. *Varszegi*, 236 Conn. 266, 274, 673 A.2d 90 (1996).

The defendant argues that the admission of the rap music video into evidence was so prejudicial as to deprive him of his constitutional right to a fair trial. Even if we assume, however, that the trial court improperly admitted the video, the defendant has failed to establish that this error was of constitutional magnitude because he has failed to demonstrate the materiality of this evidence, especially in light of the other substantial evidence of his guilt that the state offered. In addition, he failed to request any measures to limit the alleged prejudice.

Specifically, other than arguing that the rap video was central to the state's case, the defendant did not argue how the video was "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." (Internal quotation marks omitted.) *State* v. *Turner*, supra, 334 Conn. 674. Although the defendant argues that this video was improper character evidence that was offered solely to paint him as a violent person and that it infringed on the presumption of innocence and played on the jurors' biases against and stereotypes about gang members and young black men,[13] he failed to analyze the video in the context of the other evidence presented at trial. As discussed in detail in part I C 2 of this opinion, substantial evidence of the defendant's guilt that was admitted at trial supported the verdict.[14] See, e.g., *United States* v. *Moore*, 639 F.3d 443, 448 (8th Cir. 2011) (Even if evidence of the defendant's rap recordings were inadmissible, "in light of the overwhelming evidence against him, [the defendant] has failed to persuade us that the [rap] recordings affected the outcome of the [trial] court proceedings. . . . We thus conclude that their admission did not affect [the defendant's] substantial rights." (Citation omitted.)). Thus, not only has the defendant failed to argue materiality, but, on the basis of this record and the arguments presented to this court, we cannot say that the video was crucial, critical and highly significant to the jury's verdict. Accordingly, the defendant has failed to establish that the alleged error was constitutional in nature.

Nevertheless, we recognize that the rap music video contained content that had the potential to prejudice the jury against the defendant. The lyrics in the video, to the extent decipherable, reference narcotics, firearms, shootings, robberies, and threats to the police. Even if we assume that portions of the video were relevant for the purposes articulated by the state, the lyrics regarding other, unrelated criminal activity, whether fact or fiction, serve no purpose other than to portray the defendant as violent. These lyrics were irrelevant to the charged offense and did not aid the state in establishing the defendant's relationship to Beason and Ferris, his association with the 150 gang, or his access to the gun.

The defendant argues, for the first time on appeal, that the trial court should have redacted portions of the rap music video or allowed only limited screenshots of the video into evidence. He is correct that screenshots of the video may have minimized any prejudice while adequately illustrating the defendant's relationship to Beason and Ferris, his association with the 150 gang, and his access to the gun. Alternatively, portions of the video or audio could have been redacted to prevent potential prejudice. The defendant, however, did not seek to have portions of the video redacted in any

fashion before it was played for the jury. The defendant also could have requested a limiting instruction but did not do so.[15] Defense counsel's relevance objection to the admission of the video did not preserve a request for redaction. See *State* v. *Smith*, 156 Conn. App. 537, 575 n.9, 113 A.3d 103 (holding that, although defendant objected to admission of written statement at trial, objection did not preserve his claim on appeal that, if evidence was not excluded, it should at least be redacted to minimize prejudice), cert. denied, 317 Conn. 910, 115 A.3d 1106 (2015); see also *State* v. *Cecil*, 194 Conn. App. 446, 459 n.2, 221 A.3d 481 (2019) (party seeking redaction of video has duty to identify specific portions for redaction), cert. denied, 334 Conn. 915, 221 A.3d 809 (2020).

As with any evidence that might suggest a propensity for violence or might play on potential juror biases, defendants should request and trial courts should grant measures to minimize any undue prejudice, such as the redaction of irrelevant portions, the muting of all or portions of the audio, the use of screenshots in lieu of video, and limiting instructions to the jury. See, e.g., *State* v. *Franklin*, 162 Conn. App. 78, 99, 129 A.3d 770 (2015) (considering whether defendant sought to limit challenged evidence in determining whether admission of that evidence was unduly prejudicial), cert. denied, 321 Conn. 905, 138 A.3d 281 (2016). These measures are especially important when the evidence at issue is misused to show a propensity for violence or gang affiliation, as "we are cognizant that evidence relating to gangs and gang activity may, in certain circumstances, improperly arouse the emotions of the [jurors] . . . ." *State* v. *Crocker*, supra, 83 Conn. App. 640.

The defendant attempts to skirt his failure to request any redactions or a limiting instruction by arguing that the evidence at issue is unique and especially prejudicial because it involves rap music and that rap music triggers jurors' biases against and stereotypes about gang members and young black men. Rap lyrics and rap music videos that reference violent conduct, criminal activity, and gang associations, like any evidence that contains such references, may indeed at times be quite relevant and, therefore, admissible. See, e.g., *United States* v. *Pierce*, 785 F.3d 832, 841 (2d Cir.) (rap video containing lyrics relating to violence was properly admitted when "relevant and [the lyrics'] probative value [was] not substantially outweighed by the danger of unfair prejudice"), cert. denied, 577 U.S. 877, 136 S. Ct. 172, 193 L. Ed. 2d 139 (2015), and cert. denied sub nom. *Colon* v. *United States*, 577 U.S. 890, 136 S. Ct. 213, 193 L. Ed. 2d 163 (2015), and cert. denied sub nom. *Meregildo* v. *United States*, 577 U.S. 908, 136 S. Ct. 270, 193 L. Ed. 2d 198 (2015); *United States* v. *Belfast*, 611 F.3d 783, 820 (11th Cir. 2010) (rap lyrics referring to violence were admissible when relevant to charged conduct), cert. denied, 562 U.S. 1236, 131 S. Ct. 1511, 179

L. Ed. 2d 334 (2011); *Hannah* v. *State*, 420 Md. 339, 357, 23 A.3d 192 (2011) (violent rap lyrics written by defendant were inadmissible because they were not relevant to motive or intent and served no purpose other than to show defendant's propensity for violence); *State* v. *Skinner*, 218 N.J. 496, 522–23, 95 A.3d 236 (2014) (reviewing cases in which rap lyrics or rap music videos depicting violence were properly admitted as relevant to motive, intent, or identity). There is the potential that prejudice can outweigh probative value, of course. See *State* v. *Skinner*, supra, 523 (noting that sister state jurisdictions rarely admit rap lyrics depicting violence without demonstration of strong nexus between subject matter of lyrics and crime charged); *State* v. *Cheeseboro*, 346 S.C. 526, 550, 552 S.E.2d 300 (2001) (even though they were minimally probative, violent rap lyrics authored by defendant should have been excluded from evidence because they did not specifically refer to crime at issue and general references glorifying violence led to inference that defendant had propensity for violence), cert. denied, 535 U.S. 933, 122 S. Ct. 1310, 152 L. Ed. 2d 219 (2002); see also *United States* v. *Gamory*, 635 F.3d 480, 493 (11th Cir.) ("[t]he lyrics presented a substantial danger of unfair prejudice because they contained violence, profanity, sex, promiscuity, and misogyny and could reasonably be understood as promoting a violent and unlawful lifestyle"), cert. denied, 565 U.S. 1080, 132 S. Ct. 826, 181 L. Ed. 2d 527 (2011); *Boyd* v. *San Francisco*, 576 F.3d 938, 949 (9th Cir. 2009) (although admission of portions of rap lyrics written by decedent was not harmful to plaintiffs because it was more probable than not that jury would have found for defendants even without their admission, court's "[f]ailure to exclude these lyrics was error, as they had no probative value regarding [the decedent's] alleged activities [when defendant was stopped by the police], and were unfairly prejudicial in light of their offensive nature"). As with any evidence that potentially suggests that a defendant has a propensity for violence, courts must carefully balance the probative value of the evidence against any potential unfair prejudice.

Because the defendant has failed to establish that the alleged error is constitutional in nature, any error, even if we assume that error occurred, was evidentiary in nature. The defendant, however, has raised only a constitutional claim, which would require the state to prove that the error was harmless beyond a reasonable doubt. He has not briefed the issue of harmful evidentiary error. See *State* v. *Manuel T.*, 337 Conn. 429, 461, 254 A.3d 278 (2020) ("[a] nonconstitutional [evidentiary] error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict" (internal quotation marks omitted)). We therefore deem any claim of evidentiary error abandoned and decline to review it. See part I B of this opinion.

III

The defendant next claims that the trial court improperly admitted photographs of a mirror with "150," "GANG," and his initials (DT) written on it because the writings constituted inadmissible hearsay.[16] We agree with the state that, even if we assume that the writing on the mirror amounted to hearsay, it constituted a statement of a party opponent under § 8-3 (1) (A) of the Connecticut Code of Evidence.

The following additional facts and procedural history are relevant to this claim. On the night of the shooting, after the defendant's arrest and while he was in custody, the police executed a search warrant at his apartment. Detective Kimberly Biehn of the Bridgeport Police Department, who participated in the search, testified that the apartment was not open and no one was there when the police arrived, and that the entire residence was photographed prior to the search. Some of these photographs show a mirror in one of the bedrooms with writing on it that included "150," GANG" and "DT." Biehn also testified that the police found in that bedroom various paperwork, including mail with the defendant's name and address on it, from which they inferred that the bedroom belonged to him. She conceded, however, that she did not know who put the writing on the mirror or when it was placed on the mirror. She also admitted that she did not recall if there was any indication that anyone else resided at the apartment. There was another room in the apartment with a mattress, but the officers executing the search warrant did not find any evidence of a specific person living there, such as paperwork identifying another individual.

Prior to trial, the defendant moved to suppress the photographs, arguing that the writing on the mirror was inadmissible hearsay because there was no evidence as to who wrote on the mirror or when, and, thus, there was insufficient evidence for the writing to be admissible as a statement of a party opponent. The trial court issued a preliminary ruling that a sufficient foundation existed to admit the photographs of the writing as statements of a party opponent because the mirror contained the defendant's initials and was near the paperwork that identified him. The trial court explained that any argument regarding whether the room was in fact the defendant's bedroom or whether he authored the writings went to the weight of the evidence, not its admissibility. At trial, the defendant renewed his objection, which the trial court again overruled, and the defendant cross-examined Biehn about her lack of knowledge regarding who wrote on the mirror and when.

Having reviewed the trial court's decision to admit the photographs for an abuse of discretion; see *State v. Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007); we conclude that, even if we assume that the writing on the mirror constitutes a hearsay statement, it "fall[s]

within a recognized exception to the hearsay rule." (Internal quotation marks omitted.) *State* v. *Canady*, 297 Conn. 322, 341, 998 A.2d 1135 (2010). Section 8-3 of the Connecticut Code of Evidence provides in relevant part that certain statements are "not excluded by the hearsay rule, even though the declarant is available as a witness," including "(1) . . . [a] statement that is being offered against a party and is (A) the party's own statement, in either an individual or a representative capacity . . . ." It is well established that "[s]tatements made out of court by a [party opponent] are universally deemed admissible when offered against him . . . so long as they are relevant and material to issues in the case." (Citation omitted; internal quotation marks omitted.) *State* v. *Woodson*, 227 Conn. 1, 15, 629 A.2d 386 (1993).

To be admissible as a statement of a party opponent, the statement must be "properly authenticated as [a statement] made by the defendant." *State* v. *Berger*, 249 Conn. 218, 232–33, 733 A.2d 156 (1999). Rule 9-1 (a) of the Connecticut Code of Evidence provides: "The requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be." "In general, a writing may be authenticated by a number of methods, including direct testimony or circumstantial evidence. . . . Both courts and commentators have noted that the showing of authenticity is not on a par with the more technical evidentiary rules that govern admissibility, such as hearsay exceptions, competency and privilege. . . . Rather, there need only be a prima facie showing of authenticity to the court. . . . Once a prima facie showing of authorship is made to the court, the evidence, as long as it is otherwise admissible, goes to the jury, which will ultimately determine its authenticity. . . . The only requirement is that there have been substantial evidence from which the jury could infer that the [writing] was authentic." (Citations omitted.) *State* v. *Berger*, supra, 233; see C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) § 9.2.3 (distinctive characteristics, such as contents, mode of expression, circumstances and context in which unsigned document is found, may authenticate that document); see also Conn. Code Evid. § 1-3 (a), commentary ("courts are not bound by the [c]ode in determining preliminary questions of fact under subsection (a), except with respect to evidentiary privileges"); Conn. Code Evid. § 9-1, commentary (only prima facie showing of authentication required).

This court recently has emphasized that "a prima facie showing of authenticity is a low burden." *State* v. *Manuel T.*, supra, 337 Conn. 454. Additionally, our Appellate Court on several occasions has held that, to authenticate a writing, the party offering the writing into evidence may rely on circumstantial evidence, including

otherwise inadmissible evidence, such as information contained in the writing or evidence concerning where and when the writing was discovered. See, e.g., *State* v. *Jackson*, 150 Conn. App. 323, 332–34, 90 A.3d 1031 (holding that there was sufficient circumstantial evidence that defendant wrote letter at issue because it bore his name, listed prison where he was incarcerated, was dated from when he was incarcerated, and included information known by him), cert. denied, 312 Conn. 919, 94 A.3d 641 (2014); *State* v. *John L.*, 85 Conn. App. 291, 302, 856 A.2d 1032 (holding that letters were sufficiently authenticated as having been authored by defendant through circumstantial evidence that linked his presence at his home with time letters were created as well as their contents), cert. denied, 272 Conn. 903, 863 A.2d 695 (2004). Once the party offering the statement establishes a prima facie case of authenticity, any uncertainty regarding authorship goes to the weight of the evidence, and it is for the jury to determine what weight to give to the statement. See, e.g., *State* v. *John L.*, supra, 302.

As with other rules of evidence, this court, on multiple occasions, has looked to federal case law regarding the contours of the authentication requirements of § 9-1 of the Connecticut Code of Evidence. See, e.g., *State* v. *Manuel T.*, supra, 337 Conn. 456–57; *State* v. *Swinton*, 268 Conn. 781, 811–12 and 811 n.28, 847 A.2d 921 (2004); see also *Jacobs* v. *General Electric Co.*, 275 Conn. 395, 407, 880 A.2d 151 (2005) (considering federal case law when construing § 7-1 of Connecticut Code of Evidence). Federal courts have held that writings are sufficiently authenticated as being written by a defendant when they were found in the defendant's residence with other documents identifying the defendant. See, e.g., *United States* v. *Gonzalez-Maldonado*, 115 F.3d 9, 20 (1st Cir. 1997) (holding that notebook was sufficiently authenticated as result of being found in briefcase with defendant's identification card in defendant's room); *United States* v. *Thorne*, 997 F.2d 1504, 1508 (D.C. Cir.) (failure to authenticate ledgers was not plain error when "ledgers were found with documents belonging to the defendants in the bedroom dresser"), cert. denied, 510 U.S. 999, 114 S. Ct. 568, 126 L. Ed. 2d 467 (1993); *United States* v. *Huguez-Ibarra*, 954 F.2d 546, 552–53 (9th Cir. 1992) (holding that documents were circumstantially authenticated because they were found in safes at defendants' home with documents bearing their names).

The defendant contends that, because there was no evidence that he wrote on the mirror or had either exclusive use of the room or had been the last person in the room, there was insufficient evidence that he wrote on the mirror for purposes of admissibility. It is true that some courts have held that a showing that the defendant was the sole occupant of the residence where the writing was found supports authentication of a writing. See, e.g., *United States* v. *Sotelo*, Docket Nos. CR

14-652-6 and CR 14-652-10, 2016 WL 4650617, *10 (E.D. Pa. September 7, 2016) ("[T]here [was] sufficient evidence to enable the jury to determine [that the codefendant] authored or adopted the ledgers, including their discovery on a dresser in the bedroom of his residence at the time of the search. [The codefendant] [did] not argue, and [the court has] no evidence suggesting, [that] any other person residing with [him] created [those] [l]edgers." (Footnote omitted.)), aff'd, 707 Fed. Appx. 77 (3d Cir. 2017).[17]

We are not aware of any case, however, holding that sole occupation is *necessary* to satisfy the prima facie requirement of authentication. Rather, federal courts have determined that a prima facie showing of authentication exists if the location of the writing is connected to the defendant, with any uncertainty of authorship going to the weight of the evidence, rather than its admissibility. See, e.g., *United States* v. *McGlory*, 968 F.2d 309, 329 (3d Cir. 1992) (holding that notes found in trash outside defendant's residences, with other identifying documents, were properly authenticated), cert. denied sub nom. *Hauser* v. *United States*, 506 U.S. 956, 113 S. Ct. 415, 121 L. Ed. 2d 339 (1992), and cert. denied sub nom. *Cotton* v. *United States*, 506 U.S. 956, 113 S. Ct. 415, 121 L. Ed. 2d 339 (1992), and cert. denied sub nom. *Kulkovit* v. *United States*, 506 U.S. 1009, 113 S. Ct. 627, 121 L. Ed. 2d 559 (1992), and cert. denied, 507 U.S. 962, 113 S. Ct. 1388, 122 L. Ed. 2d 763 (1993), *Burgess* v. *Premier Corp.*, 727 F.2d 826, 835 (9th Cir. 1984) (holding that documents found in defendant's warehouse were adequately authenticated simply by having been found there); *United States* v. *Wilson*, 532 F.2d 641, 644–45 (8th Cir.) (there was sufficient authentication of notebooks when they were found in apartment frequented by defendant and contents of notebooks linked them to defendant), cert. denied, 429 U.S. 846, 97 S. Ct. 128, 50 L. Ed. 2d 117 (1976);[18] see also *United States* v. *Hassanshahi*, 195 F. Supp. 3d 35, 50 (D.D.C. 2016) ("[although the defendant's] arguments [that he did not author the letter] may provide fodder for urging the jury to discount the letter or to conclude that [he] did not write it, they do not suffice to overcome the [g]overnment's prima facie case and bar the letter's admission in the first instance").

In the present case, although there was not conclusive evidence that only the defendant resided in the apartment or in the bedroom where the mirror was found, there was sufficient circumstantial evidence that he was at least *an* occupant of the bedroom, such as the various documents with his name and address on them. Although there was a mattress found in another small room in the apartment, no evidence was found from which it could be inferred that a specific person resided in the apartment other than the defendant, and, at the time of the search, no one else was present in the apartment, and the apartment was not open. This cir-

cumstantial evidence linked the defendant to the bedroom in which the mirror was found, supporting the trial court's ruling that there was sufficient evidence to authenticate the writing on the mirror. There also was circumstantial evidence that the defendant had authored the writings, including his initials on the mirror and that the writing existed at the time of the search, which the police conducted on the same day as the shooting. But cf. *State* v. *Knight*, 34 So. 3d 307, 320–22 (La. App. 2010) (holding that writing found on defendant's bedroom wall was not sufficiently authenticated when writing did not appear on wall in video made during execution of search warrant and, thus, may not have existed at time of search and may have been made after defendant was arrested and no longer had access to premises), writ denied, 73 So. 3d 376 (La. 2011).

In light of this evidence and the low burden of proof necessary to establish a prima facie case of authenticity, we conclude that the trial court properly found that the state produced sufficient evidence from which the jury reasonably could have inferred that the defendant authored the writing on the mirror and that any uncertainty about authorship went to the weight of the evidence, which was for the jury to decide. In light of this conclusion, we also conclude that the trial court did not abuse its discretion in admitting the photographs as statements of a party opponent under § 8-3 (1) (A) of the Connecticut Code of Evidence.

IV

The defendant finally claims that the trial court improperly admitted portions of a recording of statements made by McIntosh over the phone to Davis describing the shooter and then identifying the shooter as the defendant. Specifically, he argues that these statements were hearsay and did not satisfy the spontaneous utterance exception to the rule against hearsay because they were made after McIntosh had an opportunity for reflection. We disagree.

The following additional facts and procedural history are relevant to this claim. As noted in part I C 2 of this opinion, McIntosh, who had known the defendant since middle school, was the passenger in a vehicle operated by Johnson on Madison Avenue at approximately noon on the day of the shooting. At trial, Johnson testified that she did not actually see the shooting, never saw the shooter with a gun, and was not certain the shooter was the defendant.

Within moments of the shooting, Johnson received a phone call from her then boyfriend, Davis, who was incarcerated, and their conversation was recorded by the correctional facility. Johnson remained on the phone with Davis while turning the car around and parking near the crime scene. Johnson informed Davis that someone had shot the victim, whom she identified

by his nickname ("Kah"), although the record is unclear how she knew him, but she did not know the shooter's identity. A majority of the recording of this conversation is indecipherable because of Johnson's crying and screaming. This portion of the recording was admitted as a spontaneous utterance and is not challenged on appeal.

McIntosh then spoke to Davis minutes after the shooting. The state offered the recording of this portion of the conversation both as a spontaneous utterance and as a prior inconsistent statement to show that she had seen the defendant with a gun, had actually witnessed the shooting, and had been certain of the shooter's identity at the time of the shooting. Outside the presence of the jury, the state played the recording, in which McIntosh identified the defendant as the shooter in response to Davis when he asked, "DT," after she had described him. See part I C 2 of this opinion. It is clear from the recording that McIntosh was upset, as her responses to these questions were punctuated by her crying and screaming. She was speaking quickly and in a hysterical tone of voice.

Defense counsel objected to the admission of the recording, arguing that McIntosh's statements came in response to questions after the shooting occurred so that she had an opportunity for reflection, although he admitted that it sounded as if McIntosh was processing aloud what she had just seen. The state responded that the statements occurred within minutes of the shooting and that the statements themselves and McIntosh's tone of voice showed that she did not have an opportunity for reflection.

The trial court ruled that this portion of the recording was admissible as a spontaneous utterance, explaining that "it certainly is in response to a startling event. . . . [I]t's a witness who has personal knowledge of that startling event . . . who is in an excited state and . . . responding without an opportunity to reflect . . . ."[19] The court then asked defense counsel if he wanted a limiting instruction to accompany the ruling, which he declined. The recording was played for the jury, with McIntosh then clarifying that what she meant when she said, "I was, like, I know that's not DT," was that she was surprised that the defendant was in the area and shocked that he had shot someone.

As discussed in part III of this opinion, for evidentiary claims, we review the trial court's legal conclusions de novo but review its decision to admit evidence, if based on a correct view of law, for an abuse of discretion. It is undisputed that the evidence at issue constitutes hearsay—McIntosh made her statements on the phone to Davis out of court, and the state offered them for their truth (i.e., the description of the shooter and her identification of the defendant as the shooter). See Conn. Code Evid. § 8-1 (3). The parties dispute whether

these statements satisfy the requirements of the spontaneous utterance exception to the rule against hearsay under § 8-3 (2) of the Connecticut Code of Evidence.

Under § 8-3 (2) of the Connecticut Code of Evidence, a spontaneous utterance is an exception to the rule against hearsay and is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." "A statement properly is admitted as a spontaneous utterance when (1) the declaration follows a startling occurrence, (2) the declaration refers to that occurrence, (3) the declarant observed the occurrence, and (4) the declaration is made under circumstances that negate the opportunity for deliberation and fabrication by the declarant." (Internal quotation marks omitted.) *State* v. *Slater*, 285 Conn. 162, 179, 939 A.2d 1105, cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008).

In assessing whether a statement was made spontaneously, no one factor is determinative, and the decision as to whether to admit the statement is left to the trial court's discretion. "The element of time, the circumstances and manner of the accident, the mental and physical condition of the declarant, the shock produced, the nature of the utterance, whether against the interest of the declarant or not, or made in response to question, or involuntary, and any other material facts in the surrounding circumstances, are to be weighed in ascertaining the basic conclusion whether the utterance was spontaneous and unreflective and made under such circumstances as to indicate absence of opportunity for contrivance and misrepresentation." (Internal quotation marks omitted.) *Rockhill* v. *White Line Bus Co.*, 109 Conn. 706, 709, 145 A. 504 (1929).

It is undisputed that McIntosh observed the shooting; the shooting took place in broad daylight in the middle of a street; it was a startling occurrence; the statements at issue referred to the shooting; and she made the statements after the shooting occurred. The defendant contends, however, that the statements describing him and identifying him as the shooter fail to satisfy the criteria for the spontaneous exception to the hearsay rule because McIntosh had the "opportunity for deliberation and fabrication" in that (1) several minutes passed between the time of the shooting and the statements, (2) during that time, McIntosh discussed the shooting with Johnson, (3) she stated explicitly that she had reflected on whether the shooter was in fact the defendant, and (4) her statements were in response to questions from Davis. According to the defendant, these facts show that McIntosh had the opportunity for deliberation and reflection. We disagree.

As to the passage of time between the shooting and the statements, this court repeatedly has explained that the passage of time "does not preclude the admission

of statements made after a startling occurrence as long as the statement is made under the stress of that occurrence. . . . While [a] short time between the incident and the statement is important, it is not dispositive. . . . [T]here is no identifiable discrete time interval within which an utterance becomes spontaneous; [e]ach case must be decided on its particular circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Kirby*, 280 Conn. 361, 374–75, 908 A.2d 506 (2006).

The witness' emotional state at the time of the statement plays a key role in determining whether sufficient time has elapsed for the witness to have had the opportunity for deliberation or fabrication. See *State* v. *Slater*, supra, 285 Conn. 179–80 (victim's emotional state at time of statement weighed against opportunity for deliberation or fabrication despite unknown lapse in time); *State* v. *Kelly*, 256 Conn. 23, 41–42, 770 A.2d 908 (2001) (sexual assault victim's statement made to sister while victim was hysterical and in fetal position fifteen minutes after altercation was properly admitted as spontaneous utterance); *State* v. *Arluk*, 75 Conn. App. 181, 188–90, 815 A.2d 694 (2003) (thirty minutes did not constitute excessive amount of time when child declarant was still under stress of having witnessed altercation); see also *State* v. *Vega*, 181 Conn. App. 456, 466–68, 187 A.3d 424 (despite several minutes having passed after shooting and witness' having responded to police officer's questions, witness' statements made while on phone and overheard by officer were spontaneous in light of witness' crying and screaming), cert. denied, 330 Conn. 928, 194 A.3d 777 (2018).

In the present case, only a few minutes passed between the shooting and McIntosh's statement to Davis. The trial court specifically found that McIntosh had been "in an excited state," and the record clearly supports this finding. McIntosh testified at trial that, after witnessing the shooting, she was upset. The trial court admitted into evidence the recording of the phone call, which included McIntosh's crying and distressed voice, for the jury to hear and to assess. Her answer to Davis' question regarding the identity of the shooter was rambling and emotional, and was broken up by her crying. The conversation began almost immediately after the shooting, with Johnson having spoken with Davis first. McIntosh then spoke with Davis within minutes of the shooting. Additionally, McIntosh remained near the crime scene when she made this statement, with Johnson having turned the car around and parked near the crime scene. Given McIntosh's emotional state and the surrounding circumstances, the trial court did not abuse its discretion in concluding that the short passage of time between the shooting and her statements was insufficient to provide an opportunity for McIntosh to deliberate or to fabricate.

The defendant also relies on the fact that McIntosh made her statement identifying him as the shooter in response to a question Davis asked. Although whether a statement is in response to a question is one factor to consider in determining the spontaneous nature of the statement, this court has explained that the fact that "a statement is made in response to a question does not preclude its admission as a spontaneous utterance." *State* v. *Kirby*, supra, 280 Conn. 376. Rather, we focus our analysis on "whether the declarant made the statement before he or she had the opportunity to undertake a reasoned reflection of the event described therein," with particular focus on the amount of time that has elapsed and the declarant's emotional state. (Internal quotation marks omitted.) Id.; see also *State* v. *Vega*, supra, 181 Conn. App. 472–74 (fact that statements were made in response to questions was not significant when declarant was emotional or near crime scene and statements occurred within minutes of crime). In the present case, the fact that McIntosh's statements were in response to questions is of little significance. The statements occurred within minutes after the shooting, while both she and Johnson were emotional and still located near the scene of the shooting. It is true that Davis asked her if the man she saw shoot the victim was "DT," but her response can reasonably be described as a stream of consciousness, spoken under emotional circumstances, rather than reflection or fabrication. After Davis' question about whether the shooter was the defendant, without pause, McIntosh stated that the shooter looked just like the defendant. Although she rambled in her statements, she continued to provide additional information about what she had witnessed, which was not relevant to the question Davis asked regarding the identity of the shooter. McIntosh stated that she saw the shooter pull out something silver-colored and that she could not see far without her glasses. Thus, the short lapse of time between the shooting and McIntosh's statement to Davis, her emotional state and proximity to the crime scene, and her having provided additional information without prompting from Davis all supported the trial court's ruling that her statement was spontaneous.

For similar reasons, we are unconvinced by the defendant's reliance on the fact that McIntosh had time to discuss the shooting with Johnson and admitted to having reflected on the shooter's identity. First, there was no evidence that Johnson and McIntosh discussed the shooting prior to the conversation with Davis, and nothing Johnson said to Davis, to the extent decipherable, identified the defendant as the shooter. Although the jury reasonably could have inferred that McIntosh overheard Johnson's conversation with Davis, as they were in the same vehicle together, there was no evidence that McIntosh was influenced by anything she heard from Johnson. The conversation between Davis and Johnson was admitted into evidence. Most of the

recording is undecipherable, as Johnson was crying and screaming during the conversation. Johnson stated that she did not know the shooter's identity. McIntosh then spoke to Davis. This lack of evidence that McIntosh heard anything substantive from Johnson regarding the shooting, coupled with the short lapse in time while they were still near the crime scene, contradicts the defendant's argument that McIntosh had an opportunity for deliberation or fabrication. Additionally, the fact that McIntosh stated, "that's not DT," was not evidence of an opportunity for reflection or fabrication but, rather, was evidence of her emotional state in light of her testimony that what she meant by this statement was that she was shocked by the defendant's presence and by the shooting. Accordingly, we conclude that the trial court did not abuse its discretion in finding that this statement constituted a spontaneous utterance under § 8-3 (2) of the Connecticut Code of Evidence.

The judgment is affirmed.

In this opinion the other justices concurred.

* September 8, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Specifically, Amato testified that he had seen videos and other depictions of Hernandez in which Hernandez portrayed himself as being a gang member, being around known gang members, flashing firearms and discussing membership in the 150 gang, and in which gang members referred to themselves as PAB—Park Avenue Boyz—which referred to the neighborhood the 150 gang controlled. Amato testified that he also relied on information gathered from debriefings of people who were under arrest, and from various informants and community members

[2] The court ruled: "I don't think that there's any surprise on this. The state's theory is, and has always been, that this a gang related retaliation; therefore, the state has a right, there's an abundance of case law dealing with motives and motive evidence of gang retaliation, and I think we've all talked about them . . . . But they deal with the fact that expert testimony is appropriate for the jury, it is a scenario where, once it is relevant to the case itself, then the question becomes whether an expert can provide the [jurors] with information that might be outside their expertise. . . . That doesn't mean that, if the state is going into something, that you shouldn't object; I'm just saying that the issue of expert testimony to explain gangs and gang behavior, particular gangs in the area, is appropriate. What is not appropriate is . . . identifying the defendant as being affiliated with a particular gang, unless there's some specific knowledge of that, which, from—from the offer of proof that was given, was not addressed. So, I'm not finding that this officer can testify to that specific but can testify to a general expertise in terms of gangs, behavior, identification of different gangs in the area, and that [type] of thing." The court emphasized that "these are not [absolute] rulings, and, to the extent that the evidence is going in one way or another and the defense feels that an objection is appropriate, please make that objection because they are not absolute."

[3] Following the jury's verdict of guilty, defense counsel moved for a new trial, arguing in relevant part that "[t]he trial court erred in permitting [Amato] to testify, where his testimony was based on hearsay, and any probative value of his testimony was outweighed by its prejudicial tendencies . . . ." The trial court denied the motion, stating that it was "stand[ing] by its rulings for the reasons articulated throughout the course of the trial."

[4] Amato testified only as to his role in downloading the video in March, 2016, and that the first screen before the video begins notes the title of the video as it appeared on YouTube. He also testified that the Bridgeport Police Department did not create the title of the video or the screen at the end of the video showing the symbol used by Snapchat to identify itself and the text, "Hotboy150." The contents of this video are discussed in part I C 2 of this opinion.

[5] The defendant also does not argue that this alleged error was so prejudi-

cial as to rise to the level of a constitutional violation.

[6] Nevertheless, we note that, although Amato was prohibited from testifying that the defendant was a member of the 150 gang, other evidence admitted at trial linked the defendant to the 150 gang, such as his Snapchat username (Hotboy150) and writing on the mirror discovered in his bedroom. From this, the jury reasonably could have inferred that the defendant was a member of the 150 gang. See part I C 2 of this opinion.

[7] For example, an expert witness improperly parrots hearsay when testifying that the defendant or another person was a gang member if that knowledge is based solely on an informant's having told the expert that the person is a gang member. See *United States* v. *Garcia*, supra, 793 F.3d 1213–14; see also *United States* v. *Dukagjini*, supra, 326 F.3d 59 (expert's testimony regarding interpretation of certain drug jargon was inadmissible when interpretation was based solely on what other people had told him those terms meant, and, thus, he "was not translating drug jargon, applying expert methodology, or relying on his general experience in law enforcement"). By contrast, an expert may rely on hearsay in forming an opinion regarding the history, organization, rules, and unique terminology or symbols of a gang. See, e.g., *United States* v. *Castelle*, 836 Fed. Appx. 43, 45–46 (2d Cir. 2020); *United States* v. *Rios*, supra, 830 F.3d 415; *United States* v. *Garcia*, supra, 1212–13; *United States* v. *LoCascio*, supra, 6 F.3d 938.

It may at times be difficult to determine whether an expert is merely parroting a hearsay statement or relying on it to support an independent opinion, especially if the expert witness is testifying in a dual capacity as both an expert and as a fact witness. See, e.g., *United States* v. *Cruz*, 363 F.3d 187, 194–95 (2d Cir. 2004). The line between expert testimony and fact testimony also may be difficult to discern given that experts may rely on their own experiences in reaching their opinions. See *State* v. *Walker*, supra, 332 Conn. 691–92. To prevent confusion and prejudice, when an expert witness also serves as a fact witness, at least one court has required the government to present the factual and expert testimony in bifurcated phases. See *United States* v. *Stanley*, Docket No. 3:15-cr-198 (JAM), 2016 WL 7104825, *2 (D. Conn. December 4, 2016); cf. *United States* v. *Rios*, supra, 830 F.3d 414 (noting suggestion by federal appeals court that, to assuage concerns that jury may be confused by witness' dual role as expert witness and fact witness, "the district court and the prosecutor [should] take care to [ensure] that the jury is informed of the dual roles of a law enforcement officer as a fact witness and an expert witness" (internal quotation marks omitted)); *United States* v. *Mejia*, supra, 545 F.3d 196 (noting concern that "line between [a police officer's] opinion and fact witness testimony [is] often hard to discern" (internal quotation marks omitted)).

The defendant, however, does not raise any alternative evidentiary claim that Amato improperly mixed factual and expert testimony, and, thus, we do not address this issue.

[8] Two other caveats are found in the relevant federal case law. First, if the trial court admits the hearsay under these circumstances, it should be accompanied by an appropriate cautionary instruction. See *United States* v. *0.59 Acres of Land*, 109 F.3d 1493, 1496 (9th Cir. 1997) (it was error to admit hearsay offered as basis of expert opinion without limiting instruction to jury); see also *United States* v. *Dukagjini*, supra, 326 F.3d 58 (citing *0.59 Acres of Land*). Second, "even if the testimony is admissible under [Fed. R. Evid.] 702 [the federal analogue to § 7-2 of the Connecticut Code of Evidence], it still must pass muster under [Fed. R. Evid.] 403 [the federal analogue to § 4-3 of the Connecticut Code of Evidence]: Its probative value must not be substantially outweighed by unfair prejudice." *United States* v. *Dukagjini*, supra, 58; cf. Conn. Code Evid. § 4-3 ("probative value [must not be] outweighed by the danger of unfair prejudice").

[9] In addition to being harmless beyond a reasonable doubt, the record in the present case also is inadequate to determine whether (1) Amato served as a conduit for hearsay, and (2) this hearsay was testimonial in nature. Specifically, in reaching his opinions regarding the rivalry between the 150 gang and the Green Hollow Boyz, the activities of these gangs, the gang affiliations of the victim and Hernandez, and the motive for the murder of Hernandez, Amato clearly relied on information he learned from others, but the record is inadequate to determine whether he merely parroted this information or whether he properly applied his experience and training to this information to reach his own opinions. As to his testimony regarding the underlying facts in the Hernandez murder, Amato testified that he learned of the shooting, arrests, and acquittals through the course of his employment. As to these statements, his testimony was clearly a conduit for hearsay.

There is no indication in the record, however, that this information was testimonial.

[10] The defendant does not raise any alternative evidentiary claim that Amato improperly served as a conduit for nontestimonial hearsay, and, thus, any evidentiary claim is abandoned.

[11] Palatiello testified that he pursued the shooter on foot but lost sight of him when the shooter ran between two houses. Palatiello then stopped to check on the victim when he heard someone screaming for help.

[12] Although the defendant claims that the improper admission of the rap music video violated his right to a fair trial in that the video was inadmissible hearsay, irrelevant, and more prejudicial than probative—all of which are normally evidentiary issues—he does not argue, alternatively, that, if this error were not constitutional in nature, these evidentiary errors were harmful.

[13] In a motion to strike filed six days prior to oral argument before this court, the state argued that, in his reply brief, for the first time, the defendant cited to two social science articles about rap music and racial prejudice, and improperly asked this court to create a new rule governing the admissibility of rap music video evidence. In the exercise of our discretion, we declined to order that these portions of the defendant's reply brief be stricken because the state's motion was untimely, as it was filed approximately three months after the defendant filed his reply brief and less than one week before oral argument before this court. See Practice Book § 60-2 ("[t]he court may . . . on its own motion or upon motion of any party . . . (3) order improper matter stricken from a brief or appendix"); see also *Ramos* v. *Commissioner of Correction*, 248 Conn. 52, 61, 727 A.2d 213 (1999) (applying abuse of discretion standard to Appellate Court decision to deny motion for permission to file late appeal under what is now Practice Book § 60-2 (5)). Nevertheless, we do not read the defendant's reply brief as raising an argument that this court should adopt a new rule regarding the admissibility of rap music videos but, rather, as merely challenging the relevance of this evidence in the present case.

[14] To the extent the defendant attempts to raise a cumulative error argument to establish that the admission of the rap music video violated his right to a fair trial when viewed in context of the other errors that he alleged, we note that this court does not recognize cumulative error and that the defendant has not urged this court to adopt the federal cumulative error standard. See *Hinds* v. *Commissioner of Correction*, 321 Conn. 56, 94–97, 136 A.3d 596 (2016). Thus, we do not address this argument.

[15] We note that, when ruling on the defendant's motion in limine to exclude the rap music video, the trial court addressed defense counsel and offered "to give any type of a limiting instruction that [the defense] would like," including an instruction that "there's no suggestion that this is the defendant who is speaking [in the] video," but the defendant did not request at that time that the trial court give any limiting instruction in relation to the video. The trial court made the same offer again when it overruled defense counsel's objection to the video at trial, but, again, the defendant did not request such an instruction.

[16] The defendant does not specifically claim that the photographs of the mirror were inadmissible because they were more prejudicial than probative. However, in a concluding paragraph in this section of his principal brief, he argues that "[t]he admission of this evidence over objection was [an] error of constitutional magnitude. The gang evidence, in combination with the rap music video and . . . Amato's testimony about monitoring violence around the city . . . perpetuated negative stereotypes and played to the worst fears of the jury. The state's evidence injected extraneous and prejudicial issues into the case that rendered a fair trial impossible."

To the extent the defendant is attempting to assert that the admission of the photographs of the mirror was more prejudicial than probative, we deem that claim inadequately briefed and decline to review it. To the extent the defendant is attempting to assert a cumulative error argument, we reject such a claim. See footnote 14 of this opinion.

[17] See *United States* v. *Sotelo*, supra, 2016 WL 4650617, *10 (evidence of authentication included writing found in bedroom of codefendant's residence, and no evidence suggested another person resided there); see also *State* v. *Reed*, 153 N.C. App. 462, 467, 570 S.E.2d 116 (sufficient authentication to admit business card into evidence when authentication, at least in part, was based on fact that card was found in defendant's residence and there was evidence that he was sole occupant of residence), appeal dismissed, 356 N.C. 622, 575 S.E.2d 521 (2002); *State* v. *Greiner*, Docket No. 106426,

2018 WL 3954312, *1 (Ohio App. August 16, 2018) (evidence of authentication included writing found in bedroom of defendant's apartment when defendant did not have roommates), appeal denied, 154 Ohio St. 3d 1432, 111 N.E.3d 1192 (2018).

[18] State courts with similar authentication rules also have held that circumstantial evidence that a writing was discovered in a defendant's bedroom is sufficient evidence of authentication, even if the defendant was not the sole occupant. See *People* v. *Olguin*, 31 Cal. App. 4th 1355, 1372–73, 37 Cal. Rptr. 2d 596 (1994) (lyrics found in codefendant's bedroom were sufficiently authenticated based on location and because content of lyrics included codefendant's nickname and reference to his gang), review denied, California Supreme Court, Docket No. S044704 (April 27, 1995); see also *Shurbaji* v. *Commonwealth*, 18 Va. App. 415, 418, 444 S.E.2d 549 (1994) (utility bills found in bedroom were circumstantial evidence that defendant controlled bedroom and that cocaine and paraphernalia found there belonged to him).

[19] The trial court also determined that McIntosh's prior statement was admissible as a prior consistent statement: "[This evidence] also goes to issues that went to impeachment," such as whether McIntosh was 100 percent certain that the defendant was the shooter at the time of the shooting. On appeal, the defendant also challenges this ground, but we do not address it given our holding that the court properly admitted the statements as spontaneous utterances.

---